492 So.2d 919 (1986)
MISSISSIPPI FARM BUREAU MUTUAL INSURANCE COMPANY
v.
John W. TODD, et al.
No. 54698.
Supreme Court of Mississippi.
March 5, 1986.
Rehearing Denied August 27, 1986.
*921 Sam E. Scott, William T. May, Heidelberg, Woodliff & Franks, Jackson, for appellant.
David W. Hall, Riley, Pintard & Hall, Natchez, Harry L. Corban, Fayette, for appellees.
Before PATTERSON, C.J., and DAN M. LEE and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
On January 27, 1981, Charles Ballard and Dr. James Mangum owned as tenants in common an empty three-bedroom house in Jefferson County, Mississippi. The house was covered by a fire insurance policy from Southeastern Fire Insurance Company, and was subject to a mortgage of $10,000 held by Farmers Home Administration (FmHA).
On January 27, 1981, Dr. Mangum granted to John and Gloria Todd an option to purchase the house. The option was for three months, and the Todds paid Mangum $1.00 for it.
Paragraph 9 of the option, a standard FmHA form, reads in pertinent part:
9. Loss or damage to the property by fire ... shall be at the risk of the seller until the deed to the buyer has been recorded, and in the event that such loss or damage occurs, the buyer may, without liability, refuse to accept conveyance of title....
The Todds accepted the offer contained in the option on April 8, 1981, and prepared to secure a FmHA loan of $24,200 for the purchase of the house. This loan was scheduled to close in late April, 1981.
In early April, the Todds asked permission to begin moving personal items into the house, although the sale had not been completed. Charles Ballard agreed to allow the Todds to move personal items into the house provided they got insurance coverage on the house. They obtained insurance coverage on the house. On April 14, 1981, Mrs. Todd went to Farm Bureau Agent Ralph Frizzell in Fayette, Mississippi, to secure insurance on the house. Frizzell issued a 30-day binder showing the owner of the house as Mrs. Gloria Todd, and insuring the house for $25,000, with no contents coverage. Mrs. Todd paid a $270.46 premium to Frizzell and then began to move her personal items into the house.
The next day, on April 15, 1981, Southeastern Fire Insurance Company canceled the policy of Ballard and Mangum on the house. At the trial, Ballard claimed this cancellation was at his request in view of the upcoming sale; Farm Bureau claimed that Southeastern canceled the policy because the house was unoccupied and isolated.
On Sunday, April 26, 1981, after the Ballard and Mangum policy had been canceled by Southeastern but before the loan was to have been closed and title conveyed, the *922 house was totally destroyed by fire. The loan closing, scheduled for April 28, 1981, was then canceled. At the time of the fire loss, Ballard and Mangum were the record owners of the house; the Todds had not obligated themselves under a note or deed of trust; and Farm Bureau had not yet received the binder, premium or application showing Mrs. Todd as the owner of the property.
On April 28, 1981, Farm Bureau adjuster, Ken Bossier, prepared a loss notice and claim report on behalf of the Todds for the total fire loss under the written binder issued to Mrs. Todd. This report showed that Ballard and Mangum still owned the house. On April 30, 1981, Bossier filed a second report, pointing out the risk of loss provision in the option and stating that Bossier had advised Ballard that Farm Bureau "would not owe for the loss since the Todds had no insurable interest in the property." (emphasis in the original) Ballard told Bossier that he canceled his previous policy when Frizzell wrote the Todd binder in reliance upon the Farm Bureau binder.
On May 4, 1981, Farm Bureau claims supervisor, Joseph Bacon, got the two Bossier reports and began an immediate investigation. Bacon instructed Bossier to question the people he interviewed concerning any conversation about any agreement between agent Frizzell and the seller. Bacon also directed an adjuster named Stevens to get information about Ballard's prior policy on the property.
On May 5, 1981, at Bossier's request, the Todds signed a non-waiver agreement to permit Farm Bureau to conduct further investigation without waiving any defenses to the claim that Farm Bureau may assert. Bossier took a statement at that time from Mrs. Todd, who said that Ballard told her she needed the binder, and that Frizzell did not tell her how the binder worked or when the policy would go into effect.
Bossier also interviewed Frizzell, who said Mrs. Todd asked for whatever FmHA needed in order to proceed with the loan. Frizzell said that Ballard reported the loss to him, and Ballard had called him before Mrs. Todd came in about the binder. Frizzell claimed that Ballard did not mention the Southeastern policy to him, and Frizzell did not tell Mrs. Todd or Ballard when the Farm Bureau coverage would be effective. However, Frizzell did tell Bossier that issuing binders prior to loan closing was neither unusual nor disapproved company practice.
On May 11, 1981, Bacon got the Stevens report on the Southeastern policy which consisted merely of a statement that it had been canceled on April 15, 1981.
On May 15, 1981, Bacon got a report from Bossier detailing his interviews with FmHA agent Taylor, who refused to cooperate because the Todd claim was unpaid and who would not discuss if or when FmHA had received notice of the cancellation of Ballard's prior policy. Because of the complexity of the claim, Bacon submitted it to his superior, State Claims Manager Magill. Magill's report to state manager Preston Geoff on May 18, 1981, reads as follows:
Technically there is, of course, no coverage. What concerns me is that the agent, although he acted improperly and in excess of his authority, did exactly what he intended  he bound coverage on a dwelling that the insured did not own nor had incurred any obligation to any mortgagee. But the agent doing exactly what he intended to do, we would be hard pressed to explain no coverage to a jury in Claiborne County.
This matter may or may not be pressed by insured or some other interested party. Just in case, I think it should be reported as a E and O claim.
Magill reiterated his recommendation that the claim be reported to Agent Frizzell's error and omissions carrier in a letter dated May 21, 1981, to the vice president of Farm Bureau's parent company, Southern Farm Bureau Casualty Insurance Co.
On May 26, 1981, Bacon learned that Ballard's prior policy was canceled at the request of the company. Bossier also reported to Bacon that Ballard and Magnum *923 still owned the property. FmHA told Bacon that they had no Ballard policy on file from Southeastern Insurance Company, only a copy of Farm Bureau's binder to the Todds.
On July 1, 1981, over two months from the date of the loss, Farm Bureau received its first letter from attorney Harry Corban, representing Gloria Todd, insured, and other unnamed parties in interest, requesting immediate payment under the binder. Magill replied by letter dated July 6, 1981, that the matter had been referred to INAX underwriting agency in Chicago, and someone representing that agency would be in touch within ten days.
On August 13, 1981, attorney Corban notified Farm Bureau advising them that INAX had not contacted him and that, unless the company replied within seven days, suit would be filed.
On August 20, 1981, Magill wrote Corban that INARPRO, Inc., in New York City, was handling the claim. Magill also wrote INARPRO the same day requesting that they make prompt contact with Corban.
On August 24, 1981, Corban wrote both Farm Bureau and INARPRO demanding immediate action on the claim. Corban told Farm Bureau that his clients were looking to Farm Bureau for payment under the binder.
On September 16, 1981, Magill memoed his file that he had tried to contact INARPRO and learned that they had referred the claim to their Jackson attorneys, who had taken little, if any, action. FmHA also contacted Magill and threatened to file suit. The next day, the local INARPRO office got a legal opinion that an insurable interest in the property did exist.
On September 28, 1981, Bacon submitted the entire claim file to general counsel and requested a legal opinion on whether an insurable interest existed in this case. Bacon noted that the company's position from the beginning was that the Todds had no insurable interest.
On October 30, 1981, attorney Corban again wrote demanding payment from Farm Bureau. In the meantime, on October 16, 1981, general counsel had written Bacon that Todd may have had an insurable interest in the property, but its value was equivalent to the amount paid for the option to purchase the property. Counsel noted that the option itself stated that the risk of loss does not pass until the deed to the Todds was recorded. There was a caveat to Farm Bureau, however, that frequently consideration far exceeded the stated dollar amount. The opinion recommended that Farm Bureau determine what the Todds paid and tender that amount, plus the premium refund, to attorney Corban, along with an explanation of why this amount was being paid. A rough draft of a suggested letter was enclosed by general counsel for Farm Bureau's consideration.
On November 2, 1981, Bacon wrote to attorney Corban indicating his company's willingness to indemnify the Todds to the extent of their actual pecuniary loss, namely the amount paid for the option. Bacon requested documentary evidence of the amount paid for the option and a full assignment of his clients' rights and release of any obligation to the Todds, any mortgagee, and any other persons with an interest in the property. Bacon concluded in his letter that it would have been impossible for the Todds to have suffered any loss above the amount of the option, since any loss caused by fire was the responsibility of the seller until the deed to the Todds was recorded. Corban did not respond.
Instead, on December 30, 1981, the Todds, Ballard and Mangum filed suit against Farm Bureau under the written binder, alleging that Farm Bureau knew and had consented to Ballard and Mangum cancelling their insurance to allow the Todds to get an insurance binder on the property without double coverage.
On June 3, 1982, the plaintiffs amended their complaint to add agent Frizzell as a party defendant. The amendment charged that Farm Bureau was liable to the Todds under the written binder and to the co-owners *924 Ballard and Mangum under an oral binder allegedly given by Frizzell in a conversation with Ballard. The plaintiffs also agreed to permit the jury to return one verdict representing the damages sustained by all of them. Alternatively, recovery was sought against Frizzell under his errors and omissions policy.
The trial involved the testimony of six witnesses called in the plaintiffs' case in chief:
1. Harry Corban, attorney, testified that the risk of loss provision in the option was a standard FmHA provision. He admitted that his first letter to Farm Bureau was on behalf of Gloria Todd and other parties not identified by him in his letter. He could not recall writing anything to Farm Bureau about any claim that Mangum or Ballard were insured under the binder. His letters did show that copies of his letters were being sent to Ballard and Mangum. Corban considered Bacon's letter of November 2, 1981, a denial of the claim and, therefore, did not answer it.
2. Ralph Frizzell, called as an adverse witness, testified that he had issued more than 100 insurance binders to be given to FmHA for a person who was purchasing property but was not yet the owner. Mrs. Todd told him that she did not own the house but was buying it from Ballard. He listed Mrs. Todd as the owner anyway because the application and binder had no place to enter the seller's name and he had never done so. Until this case, Farm Bureau had never "kicked back" on a binder like this to his knowledge. Farm Bureau knew the procedure Frizzell followed and that the owner's name was not on the application or binder. Frizzell admitted a conversation with Ballard but could not remember telling him the house was covered. Frizzell did not deny that he said that to Ballard. He simply did not remember. A non-suit as to Frizzell was granted after his testimony.
3. Gloria Todd testified that she asked Mr. Ballard for permission to move into the house before the sale, and Ballard told her she could do so only if she had insurance coverage on the house. She told Mr. Frizzell that she was buying the house from Ballard and Mangum and wanted her husband and "all of us" covered by insurance, meaning both Todds, Ballard and Mangum. Frizzell told her that she had coverage and she relied upon him to do the papers. She took the binder to FmHA and then went to Ballard's office and found him on the phone with Mr. Frizzell.
Mrs. Todd was then asked if she and the other plaintiffs had agreed that the jury could bring in one verdict for all of them. Mrs. Todd said that she had so agreed. Farm Bureau objected and the objection was sustained. The trial court then overruled the objection because the question merely asked if such an agreement was contained in the complaint. Mrs. Todd was then asked what the agreement was. When Farm Bureau did not object to this question, Mrs. Todd replied that she would take $600 for her loss and anything above that amount the plaintiffs would split.
Farm Bureau then moved for a mistrial, which was denied, based upon their failure to object to the question.
Mrs. Todd admitted that her total cash outlay for the option was $1.00, and that her $270.46 premium had been refunded by Farm Bureau. She also said that, while she had many personal items lost in the fire, she had not purchased insurance on contents.
4. Charles Ballard testified that he was a retired loan supervisor for FmHA. At the time of the trial, he was in a real estate partnership with Dr. Mangum. In his experience it was not unusual to make out a binder in the name of the buyer where there was an option to purchase. Ballard testified that he told Mrs. Todd she could move into the house after she got insurance because he canceled his prior insurance on April 15, 1981, and did not want the house uninsured. The Farm Bureau binder was issued one day before Ballard's insurance was canceled.
Ballard testified that on April 14, 1981, he called Frizzell to be certain that he and *925 Mangum, as well as the Todds, were covered under the new policy binder. Frizzell told him that he had insurance. Ballard stated that had Frizzell told him that only Mrs. Todd was covered Ballard would have immediately told him to issue the binder to him and Mangum, rather than to Mrs. Todd; he did not do so because he trusted Frizzell's word that he and Mangum were also covered. He said that Frizzell left his name off the binder in spite of his instructions from Mrs. Todd and the call from Ballard.
5. Dr. James Mangum testified that his role in the Ballard partnership was to raise money while Ballard handled the loan and sale arrangements. Had Frizzell told Ballard that they were not covered, Mangum could have obtained coverage through his regular insuror, who had handled his business for 30 years.
6. Joseph Bacon. This claims supervisor from Farm Bureau admitted that Ralph Frizzell was a general agent of Farm Bureau and had authority to put someone other than the owner on the binder, thus affording coverage. He admitted that Farm Bureau knew what Frizzell was doing but did not know that Frizzell was claiming that the binder did not go into effect until after the loan was closed.
Bacon was aware that Ballard owned the property. It did not occur to Bacon why Ballard's name was not on the binder. Bacon took the position that one who has exercised an option and was moving into the house had no insurable interest in the property. He did admit that early on in the investigation he wanted to know if there was any agreement between Frizzell and Ballard. Even though Bacon acknowledged that his general counsel told him that the Todds could have an insurable interest in the house, he concluded that they did not. He further admitted that he did not use the proposed letter sent to him by his general counsel when he wrote the unanswered letter to attorney Corban.
Bacon admitted that Frizzell knew that Ballard and Mangum and not Mrs. Todd owned the property when he made the application and binder in Mrs. Todd's name. He also admitted that the original company position was that Todd had no insurable interest but that this position was changed by general counsel's letter to that of a possible insurable interest.
7. Joe Harper, Farm Bureau underwriter, said that the application for insurance by the Todds was rejected because when he viewed the pictures of the house it appeared to him to be unoccupied. He did not reject the policy and refund the premium until he learned that the house had been burned, however.
At the close of this testimony, the annual statement of profits of Farm Bureau was admitted into evidence over objection.
Farm Bureau's motion for a directed verdict stated seven grounds including Mangum and Ballard failed to make out a prima facie case of any liability; failed to prove the elements of an oral contract of insurance; failed to prove that they were covered under the written binder of insurance; and failed to make out a case for punitive damages.
Farm Bureau further argued that any claim of the Todds over their actual investment in the property was not payable as a matter of law and was, therefore, not a jury issue. This motion was overruled. When the plaintiffs rested, the defense also rested.
Instruction P-2, granted over objection by defendant, reads:
In this case, Mississippi Farm Bureau Mutual Insurance Company, was under a duty to pay for the fire loss with reasonable dispatch, and it was under a duty not to arbitrarily reject the payment of the loss, and if you believe from a preponderance of the evidence in this case that Mississippi Farm Bureau Mutual Insurance Company failed to exercise good faith in unreasonably prolonging the payment of the fire loss, if such was done, but instead acted arbitrarily in an attempt to escape a just debt, then, in such event, you have a right to award damages by way of punishment, to deter *926 actions of a similar nature in the future. These damages are called punitive damages. You may award punitive damages in addition to actual damages, and the amount of the punitive damages is solely within your discretion.
Farm Bureau objected that the instruction did not accurately state the Mississippi law on punitive damages; that the language relating to an attempt to escape a just debt was prejudicial; and that a granting of any instruction for punitive damages was not warranted under the evidence in this case.
Instruction P-5, granted over Farm Bureau's objection, reads:
The Court directs you, the jury, to bring in a verdict for all of the Plaintiffs for the sum of $25,000.00, which represents the actual damages sustained by the Plaintiffs.
You are further directed that if you find from a preponderance of the evidence in this case that the Plaintiffs are entitled to punitive damages, then you may bring in a sum of money in excess of the $25,000.00 for an amount that is solely within your discretion.
If you find from a preponderance of the evidence in this case that the Plaintiffs have sustained only actual damages, then the form of your verdict, written upon a separate sheet of paper, may be in the following form:
"We find for the Plaintiffs in the amount of $25,000."
In the event that you find that the Plaintiffs are entitled to punitive damages, then the form of your verdict, written upon a separate sheet of paper, may be in the following form:
"We find for the Plaintiffs for $25,000.00, actual damages, and $ ____ as punitive damages."
Defense counsel objected to the direction of a verdict for the plaintiffs on the grounds that, as a matter of law, the interest of the Todds was limited to their pecunicary interest in the property; that Ballard and Mangum had not established coverage under either an oral contract or the written binder; that if Ballard and Mangum had been named in the binder, Farm Bureau would have been required to include a mortgage clause to assume liability for the FmHA mortgage, and, thus Farm Bureau was still exposed if Mangum and Ballard were allowed to recover; that the instruction allowed all plaintiffs a windfall in that the Todds had invested only $1 and Ballard and Mangum had only invested $10,500 in the property; and that the instruction allowed the question of punitive damages to go to the jury, despite the presence of an arguable reason for Farm Bureau's handling of the claim.
The court granted Instruction D-12, which reads:
The Court instructs the jury that punitive damages should be assessed as an example and warning to others, and that they should be allowed only with caution and within narrow limits. The Court further instructs the jury that if an insurance company has a legitimate or an arguable reason for failing to pay a claim, punitive damages will not lie. The Court therefore instructs the jury that if you find from the evidence in this case that Mississippi Farm Bureau Mutual Insurance Company had a legitimate reason or an arguable reason for failing to pay the claims of Plaintiffs, then you may not return a verdict against Mississippi Farm Bureau Mutual Insurance Company for any punitive damages.
The court refused instruction D-3, which would have directed a verdict for Farm Bureau on all punitive damages claims. Instruction D-5, also refused, would have directed the jury that in order for the Todds to recover they must prove by a preponderance of the evidence that they had an insurable interest in the property, saying such an interest exists when a person will derive pecuniary benefit or advantage by the preservation or continued existence of the property, or will sustain pecuniary loss from its destruction.
Instruction D-6, also refused, would have told the jury not to return a verdict against Farm Bureau for an amount beyond the insurable interest, if any, of the *927 Todds, regardless of the face amount of any insurance policy written for the Todds.
Instruction D-7, also refused, would have directed a verdict for Farm Bureau on any claims made by Ballard and Mangum.
Instruction D-13 was refused. It would have told the jury that in order to find that there was a valid oral contract between Ballard and Farm Bureau, it must first find by a preponderance of the credible elements (sic) that there was an identity of property intended to be insured; that there was an identity of the risk to be insured against; that there was a specific period that the insurance was to be in force; that there was a promise to pay a fixed or ascertainable amount for the coverage; and that there was an identity of the premium to be paid for the coverage. Instruction D-13 would have told the jury that if the plaintiffs have failed to prove by a preponderance of the credible evidence each of the above elements, then it should return a verdict for Farm Bureau on Mangum's and Ballard's claim.
Instruction D-15, also refused, would have told the jury that in the event they find for the Todds, they could not award them a sum greater than $1.00.
Special interrogatories to the jury, which were refused, would have required the jury to state the specific amount which the Todds were entitled to recover; state the specific amount that Ballard and Mangum were entitled to recover; and state whether Frizzell bound fire insurance coverage on the house in favor of Ballard and Mangum.
After deliberating a short period, the jury returned a verdict for $25,000 actual and $250,000 punitive damages. Motions for JNOV, for a new trial, and for a remittitur, were all overruled by the court.

I.

DID THE TRIAL COURT ERR IN GRANTING A DIRECTED VERDICT (a) FOR BALLARD AND MANGUM UNDER THE ORAL OR WRITTEN BINDER: AND (b) FOR THE TODDS, IN AN AMOUNT EXCEEDING THEIR ACTUAL PECUNIARY INVESTMENT IN THE PROPERTY?
The issue raised by Farm Bureau here is the propriety of the trial court in granting instruction P-5 which directed the jury to bring in a verdict for all of the plaintiffs for the sum of $25,000, representing the actual damages sustained by them. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 656 (Miss. 1975), recognizes that a motion for directed verdict and a request for peremptory instruction necessarily contemplate a consideration of different evidence and inferences arising during the course of trial.
A motion for a directed verdict encompasses testimony of the plaintiff and its favorable inferences, whereas, the evidence considered on a request for a peremptory instruction or a judgment NOV embraces the testimony in behalf of the plaintiff as well as that of the defendant, there being no difference between that considered for a peremptory instruction and a judgment NOV since the latter is entertained only to correct the court's error in refusing a requested peremptory instruction. [citations omitted]
Id. at 656. The peremptory instruction rule in Paymaster Oil permits the court to examine the evidence of both parties that is not in conflict in order to reach a legal conclusion.
Weems v. American Security Insurance Co., 450 So.2d 431 (Miss. 1984), discusses the analysis the trial court must undertake when faced with a request for peremptory instruction.
Where such a request has been made, the trial court must consider all of the evidence  not just the evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is *928 required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied... . [citations omitted].
Id. at 435.
The proof in this case consists of the testimony of the witnesses called in the plaintiffs' case in chief, as well as Exhibits introduced into evidence, including the claim file. The defendants presented no evidence. Farm Bureau's evidence consisted of its cross-examination of the plaintiffs' witnesses, including three Farm Bureau field representatives called by the plaintiffs as adverse witnesses, and the exhibits introduced as part of cross examination. Application of the Paymaster Oil rule in this case requires the Court to compare the evidence elicited on direct examination with that produced on cross examination; determine what, if any, facts are uncontradicted in the proof; and consider all of the evidence together with all favorable inferences reasonably to be drawn from the evidence in the light most favorable to Farm Bureau.

A. ORAL BINDER
Farm Bureau asserts that the proof was insufficient to establish the existence of an oral binder of insurance between Ballard, Mangum, and Farm Bureau. Alternatively, Farm Bureau asserts that at most there was a disputed factual issue as to the existence of the oral binder. Farm Bureau argues the trial court erroneously ruled that the proof was undisputed that Farm Bureau agent Frizzell issued an oral binder covering Ballard's and Mangum's interest in the property.
Farm Bureau presents us with a two-pronged attack under this assignment. They do not challenge the general authority of Agent Frizzell, and we are not faced with that issue.
Farm Bureau first argues that Ballard and Mangum have the burden to prove by clear and convincing evidence the existence of an oral contract of insurance. For this proposition, Farm Bureau relies on three cases: American Bankers' Insurance Co. v. Lee, 161 Miss. 85, 134 So. 836 (1931); Canal Insurance v. Bush and King Trucking, 247 Miss. 87, 154 So.2d 111 (1963); and Smith Trucking Co. v. Cottonbelt Insurance Co., 556 F.2d 1297 (5th Cir.1977).
The first case relied upon, American Bankers' Insurance co., supra, dealt primarily with a soliciting agent's authority to issue oral binders of insurance, and the Court held that the proof was insufficient to show the soliciting agent possessed such authority. This issue is not before us in this case. The language relied upon by Farm Bureau is quoted as follows:
No presumption exists, however, that the company's agents have authority to make a parole contract to insure; such authority must be proved affirmatively. Of course, a parole contract to issue or renew a policy must be clearly established. [citations omitted]
161 Miss. at 106, 134 So. at 840.
It is undisputed that Ballard and Mangum met their burden of proof as to the authority of Frizzell to make the parole contract to insure. Farm Bureau argues that they have failed to clearly establish the oral contract, however.
In Canal Insurance v. Bush and King Trucking, supra, the majority opinion written by Justice Lee upheld a verdict for the insured based on an agent's oral extension of the radius of coverage under an existing policy. In upholding the oral contract, Presiding Justice Lee, writing for the majority, said: Stated simply, that "... the Court is of the opinion that the oral contract in this case, if made, is enforceable." 154 So.2d at 119. For the authority that the burden of proof is clear and convincing evidence, Farm Bureau must go to the dissent in this case, which stated that the unanimous rule appears to be that "oral contracts of insurance must be established by clear and convincing evidence or, as sometimes stated, *929 by full and clear proof. 15 ALR 1004; 69 ALR 565; 92 ALR 236. Our own Court is in accord. American Bankers' Insurance Co. v. Lee, 161 Miss. 85, 134 So. 836." Among other things, the dissent took the position that the oral modification had not been proven by clear and convincing evidence. 247 Miss. at 109-10, 154 So.2d at 121. The majority was, therefore, of the opinion that an oral contract could be enforced without mention of the burden of proof and the dissent took the position that the one sentence in American Bankers' Insurance Co. v. Lee, supra, should be interpreted so that clearly established means "clear and convincing evidence".
In the Smith Trucking Co. case, supra, the Fifth Circuit upheld a Mississippi District Court's verdict of liability under an oral extension of the radius of coverage in a commercial trucking policy. Quoting 44 Am.Jur.2d Insurance, § 2040, the Fifth Circuit held that oral contracts of insurance "must be established by clear and convincing evidence, full and clear proof, etc., and [that] it must be shown that each party understood its terms in the same light." 556 F.2d at 1304. The Federal Court decision, while bearing out the argument of Farm Bureau, cites no Mississippi authority in spite of the fact that there existed both American Bankers' Insurance and Canal Insurance, supra, at the time the opinion was written. Rather than rely upon the interpretations of Mississippi law by the Mississippi Supreme Court, the Fifth Circuit chose instead to ground its decision on 44 Am.Jur.2d Insurance § 2040.
In the second prong of this assignment, Farm Bureau contends that it was entitled to a directed verdict because the specific elements of an oral insurance agreement were not clearly and convincingly proven by the testimony. Employer's Fire Insurance Co., et al. v. Speed, et al., 242 Miss. 341, 133 So.2d 627 (1961), was a case in which this Court reversed and entered judgment for the insurance company on the ground that no contract was established where the agent failed to designate which of the companies he represented were to be the insurors. That issue is not present here. However, the Speed Court noted that sufficient proof must be made as to the required elements of an oral insurance contract.
We also assume that the proof was sufficient to establish specifically the amount of insurance, the rate of the premium, the commencement of the risk, and the duration of the risk. The proof shows, however, that there was no agreement as to what company or companies were to be the insurors.
242 Miss. at 347, 133 So.2d at 630.
In McPherson v. McLendon, 221 So.2d 75 (Miss. 1969), this Court reversed a directed verdict for the insuror and held that the terms of the alleged oral contract had been sufficiently established to make it a jury question as to whether a contract of insurance had been entered into by the parties. Id. at 79. The agent filled out an application for the insured which contained the subject matter, period, rate, and amount of insurance to be issued and, upon receipt of the premium, informed the insured that he was "covered". Id. at 77.
In addition to these arguments, Farm Bureau points out that a binder is a contract for temporary insurance, until either a permanent policy can be written or its issuance approved or disapproved by the insuror. 43 Am.Jur.2d Insurance Sec. 219, p. 304 (1982). See also, 14 A.L.R. 568, Temporary Insurance, Sec. 2 (1967). Farm Bureau points out that at no time following the conversation between Frizzell and Ballard on April 14, in which the oral binder of insurance was allegedly made, did Ballard or Mangum take any further steps to obtain a written binder or application for insurance.
We conclude that the arguments of Farm Bureau are without merit. Even if the burden of proof for establishing an oral contract of insurance is clear and convincing, this record establishes that there was an oral contract of insurance and it is based upon the uncontradicted word of one man. When one compares the testimony of Ballard and Frizzell, there is demonstrated *930 without question that Frizzell admitted having had a conversation with Ballard and did not deny telling him that Ballard and Mangum were "covered", saying only that he, Frizzell, could not recall the substance of the conversation. In Paymaster Oil, supra, the farmer's testimony as to the terms of a soybean sales contract was held to be undisputed by the testimony of the buyers' representative who said, "I cannot testify as to the specifics of the conversation, I cannot," and repeated that he simply did not know and could not recall any part of the conversation with the farmer. 319 So.2d at 657.
A valid oral contract of insurance must be specific, either expressly or by implication, as to the subject matter, period, rate and amount of insurance. 44 C.J.S. Insurance, sec. 230, p. 963. Employers Fire Insurance Co. v. Speed likewise requires proof of amount, rate, commencement and duration of the risk, as well as the identity of the insuror.
We imply from the context of the conversation between Ballard and Frizzell that Ballard and Mangum intended and Frizzell agreed to obtain coverage identical to that given to Mrs. Todd under the written binder and the application for insurance. A reasonable implication follows that Ballard and Mangum desired $25,000 fire insurance coverage on the property at the same rate, commencing on the same day until title was transferred to the Todds.
Reliance can be placed upon Cummings v. New England Insurance Co., 266 F.2d 888 (5th Cir.1959), where interpreting Mississippi law, the Fifth Circuit held that an agreement to bind fire insurance which failed to fix the amount of the premium or the rate would not prevent the binder from becoming effective. Cummings, supra, stands for the proposition that these two elements of the contract may be implied from what the ordinary and reasonable rate and premium would be under the circumstances.
The only element not readily susceptible of inference from the facts as they existed on April 14th is the period or duration of the risk. The Todds' FmHA loan was not approved until April 20, six days after the oral binder, and no specific date was set for the loan closure and title transfer which attorney Corban testified would take place on the Tuesday following the arrival of the loan check. It is reasonable to infer that the one-year policy covered Ballard and Mangum for that portion of the year in which they were owners of the property, with the Todds being covered for the remainder of the year, under one premium. This is similar in effect to the assignment of a policy from the vendor to the purchaser.
The general rule permits the essential terms of an insurance binder to be supplied by implication, but these terms must be readily inferable from the prior course of dealing between the parties, Smith Trucking Co., Inc. v. Cottonbelt Insurance Co., 556 F.2d 1297 (5th Cir.1977), or from established insurance business standards, Cummings v. New England Insurance Co., supra. In this case, the subject matter, amount, commencement of risks, premium and rate for the oral binder are readily inferable from the terms of the written binder issued to the Todds. Furthermore, the duration of the risk inferable from the facts known both to Ballard and Frizzell, and Frizzell's standard of practice of issuing binders under such circumstances in the past.
We conclude that Ballard and Mangum made out a prima facie case for an oral binder through Ballard's uncontested testimony and that Frizzell assured him that he and Mangum were insured along with Mrs. Todd. The burden of proving by clear and convincing evidence the existence of an oral binder is satisfied where an agent orally informs a person that he is "covered" along with another, impliedly providing coverage identical to the other's policy.
*931 Farm Bureau argues in the alternative that this case should be remanded to permit the jury to pass on the factual question of whether an oral binder of insurance was created by the conversation between Ballard and Frizzell. The basis of this argument is that even if Frizzell's testimony does not directly contradict Ballard, Ballard's credibility as a witness is a fact question for the jury.
However, when we apply the Paymaster Oil test, supra, we conclude that when all of the evidence and reasonable inferences are considered in the light most favorable to Farm Bureau, Ballard's uncontradicted testimony that he and Dr. Mangum were included under the Todd's binder points so overwhelmingly in Ballard's and Mangum's favor that reasonable men could not have arrived at a contrary verdict. Therefore, the trial court properly granted a peremptory instruction on the oral binder in favor of Ballard and Mangum.

B. WRITTEN BINDER
The issue here is whether or not the Todds, notwithstanding the $25,000 face value of the policy, could recover as a matter of law in excess of their insurable interest in the property under their option, e.g., $1.00.
The general rule in Mississippi as stated in Southeastern Fidelity Insurance Co. v. Gann, 340 So.2d 429 (Miss. 1976), is that an insurable interest must exist in an insured when the contract is entered for it to be effective. In Gann, an insurable interest was found in property even though the legal title was elsewhere. Gann was found to be subject to economic loss at the time the policies were issued if the building were destroyed. Id. at 433-34.
Todd's position on the other hand is that Southeastern Fidelity Insurance Co. v. Gann, supra, establishes their insurable interest in the property although the legal title was elsewhere since they would suffer economic loss if the property was destroyed. The Todds argue that since the insurable interest exists, as a matter of law, that the contract is not void as against public policy. Having proven the existence of a written binder, and established an insurable interest in the property, the Todds argue that the extent of their recovery should be determined by reference to the face value of the policy. Indeed they contend that it is irrelevant how the $25,000 is to be divided so long as Farm Bureau disburses the face value of the policy and obtains a release from the interested parties.
We consider this argument in the light of Mississippi Code Annotated § 83-13-5 (1972) commonly referred to as the "Valued Policy Statute." It provides in pertinent part:
No insurance company shall knowingly issue any fire insurance policy upon property within this state for an amount which, together with any existing insurance thereon, exceeds a fair value of the property... . When buildings and structures are insured against loss by fire and, ... are totally destroyed by fire, the company shall not be permitted to deny that the buildings or structures insured were worth at the time of the issuance of the policy the full value upon which the insurance is calculated, and the measure of damages shall be the amount for which the buildings and structures were insured.
This statute, dating to the Code of 1892, essentially bars an insurer from arguing that the value of the insured property totally destroyed by fire is less than the amount for which the property was insured.
In Mississippi Fire Insurance Co. v. Planters Bank, 138 Miss. 275, 103 So. 84 (1924), we held that a lessee had an insurable interest in a leased building and was entitled to rely upon the valued policy statute to recover the full amount named in the policy. We rejected the insurer's argument that the lessee's recovery should be limited to the value of his insurable interest, namely the leasehold. We said:
[N]or are [the valued policy statute] provisions against public policy, because the insurance company is under no duty to issue insurance to a lessee for any greater *932 amount than the value of the leasehold. It enters into the contract with its eyes open and receives the premium from the lessee with full knowledge of the situation, and such a contract does not, in our judgment, come within the condemnation of "a wager or gambling contract."
In the case before us the insurance company accepted the risk, received the premium, with full information that it was insuring the leased premises in favor of the lessee, and it knew the amount named in the face of the policy would, under the statute, be recoverable in the event of a total loss. In such a case we are not prepared to say there exists a public evil that should vitiate the contract as being against public policy.
Id. at 282, 103 So. at 86.
Furthermore, in Hartford Fire Insurance Co. v. Clark, 154 Miss. 418, 122 So. 551 (1929), we held that where the character of the insurable interest is communicated to the agent, his knowledge is imputed to the principal. Therefore, the insurer is liable under the valued policy law for the amount named in the policy, regardless of the extent of the insurable interest. Id. at 429-31, 122 So. at 553-54. Clark, supra, allowed full recovery for an insured whose interest in the property, a reservation of timber rights, was disclosed to the agent, even though his application stated he was the sole record owner. Id. at 424, 122 So. at 552-53.
Following the statute and the reasoning of the two cases cited above, we conclude that where an insurer enters into a contract with its eyes open and received the premium with full knowledge of the situation, it is bound by the valued policy statute to pay the face value of the policy, notwithstanding that such amount exceeds the value of the insurable interest.
This being so, there is no merit to this assignment of error.

II.

PUNITIVE DAMAGES
Farm Bureau contends that it was error to submit the question of punitive damages to the jury. Farm Bureau bases this claim on the contention that there existed legitimate and arguable reasons for denying the claim for fire loss.
In State Farm Fire and Casualty Co. v. Simpson, 477 So.2d 242 (Miss. 1985), Chief Justice Patterson speaking for the Court published an enlightening review of the law of punitive damages in Mississippi. In Simpson, we reversed an award of punitive damages on the basis that the insurance company had an arguable reason to refuse to pay. The evidence in that case showed peculiar circumstances in that there was a question of arson. No such question arises in this case.
In Southern United Life Insurance Company and First State Bank of Waynesboro v. Caves, 481 So.2d 764 (Miss. 1985) we stated:
In the leading case of Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), which involved the wrongful refusal by an insurance company to pay a claim due on a credit life insurance policy, this Court held: Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the claim filed with it. We therefore hold that punitive damages were allowable.
Southern United Life Insurance Co. v. Caves, at 768; Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d at 248.
Thus the standard to be applied in determining whether punitive damages will lie is whether the insurance company had an arguable reason for failing to pay a claim, "and the evidence in each particular case will decide whether a punitive damage instruction must be granted or refused." See State Farm Fire and Casualty Co. v. Simpson, 477 So.2d 242, footnote 2.
Simpson contains this cautionary language:

Standard Life v. Veal, supra, provides that punitive damages will not lie if the *933 carrier has an arguable reason for denying the claim. It does not necessarily follow, however, that punitive damages are mandated by the absence of an "arguable reason." This is so because the denial of a claim could be the result of an honest mistake or oversight  ordinary or simple negligence  not reaching the heightened status of an "independent tort" as set out in Veal, supra, and other cases.
477 So.2d at 250.
Here the trial court peremptorily instructed the jury to bring in a verdict for all of the plaintiffs for the sum of $25,000.00, which represented the actual damages sustained by the plaintiffs.
The standard we must apply is the same as in any other case that:
The rule is well established that when considering a request for peremptory instruction "all evidence with reasonable inferences flowing therefrom must be accepted as true in favor of the party against whom the peremptory instruction is requested, all evidence in conflict therewith is disregarded, and, if such evidence is sufficient to support a verdict for the party against whom the peremptory instruction is requested, then it should be denied." Wiley v. Keen, 404 So.2d 1025, 1026 (Miss. 1981).
See also Barkley v. Miller Transporters, Inc., 450 So.2d 416, 419 (Miss. 1984).

A.

BALLARD AND MANGUM
Farm Bureau asserts their arguable reason not to pay the claim of Ballard and Mangum rests ultimately upon the complete failure of Ballard and Mangum to inform Farm Bureau that they had any insurance claim whatsoever for the fire loss. Their names did not appear on the written binder or the application for insurance. In the investigation of the fire loss, which included conversations with Ballard, nothing was ever said indicating that Ballard or Mangum intended to be insured under the oral or written binder. None of the correspondence Farm Bureau received from Corban ever stated that Ballard and Mangum were making a claim against Farm Bureau under an alleged oral binder or the written binder.
However, some of attorney Corban's letters to Farm Bureau showed Ballard receiving a copy of the correspondence.
Furthermore, Frizzell was an agent of Farm Bureau and is charged with knowledge that Ballard and Mangum were claiming coverage under the binder.
Mr. Magill's report to state manager Geoff contained in the claims file conclusively shows that Farm Bureau had knowledge of the claim of Ballard and Mangum. This report points out that agent Frizzell did exactly what he intended to do, he bound coverage on a dwelling that the insured did not own nor had incurred any obligation to any mortgagee. But the agent did exactly what he intended to do and in the opinion of Magill this case should be reported as an errors and omissions claim.
We, therefore, conclude that taking the facts in the light most favorable to Farm Bureau, Mangum and Ballard were entitled to recovery on the oral binder as a matter of law. Without the affirmative acts of agent Frizzell, Ballard and Mangum could have obtained other insurance on the house but instead relied on the assurance of Frizzell that Ballard, Mangum and the Todds were covered by the binder.
Knowledge of this act is imputed to Farm Bureau as well as being within their actual knowledge based on their own claims file.
As this is true, then Farm Bureau had no arguable reason to deny the claim of Ballard and Mangum.

B.

THE TODDS
Farm Bureau contends that it had an arguable reason for refusing to pay the Todds any amount in excess of their actual pecuniary investment in the property, the *934 $1.00 option. From the outset, Farm Bureau took the position that as they were not the owners of the property the Todds had no insurable interest therein. They maintained this position, even after they had been informed by their general counsel in Mississippi that the Todds had an insurable interest.
The Todds rely upon a number of statements in the claims file and at trial to establish Farm Bureau's bad faith handling of their claim. Less than a month after the loss, claims manager Magill acknowledged that Frizzell did what he intended to do and admitted that he would be hard pressed to explain to a jury that there was no coverage. Magill further admitted in another letter that Mrs. Todd made no misrepresentations of fact in order to obtain the binder. Finally, in September, 1981, Magill acknowledged that the matter had been dragging quite badly and this delay could not be charged to Ballard, Mangum or the Todds. It must not be overlooked that at the time the claim was rejected the official reason offered by underwriter Harper was that the property was unoccupied.
We conclude that, after taking the facts in the light most favorable to Farm Bureau, the Todds were entitled to recover the face value of the written binder under the valued policy as interpreted in Planters Bank and Clarke cases, and that Farm Bureau had no legitimate or arguable reason for refusing to pay the face amount of the binder and the submission of the punitive damages issue by the trial court was proper.
As a side issue, Farm Bureau challenges instruction P-2 as not accurately stating the law in Mississippi on punitive damages. However, when we turn to instruction D-12, which was also granted by the trial court, and which follows almost verbatim the language of Consolidated American Life Insurance Co. v. Toche, 410 So.2d 1303, 1304-05 (Miss. 1982), and Standard Life Insurance Co. v. Veal, supra, we are compelled to hold that by reading the jury instructions as a whole to determine whether or not the jury was correctly instructed, the challenge to instruction P-2 must fail. Jackson v. Griffith, 390 So.2d 287 (Miss. 1980).
It is axiomatic that defects in instructions do not require reversal where all instructions taken together fairly announce the applicable law. Allen v. Blanks, 384 So.2d 63 (Miss. 1980).

III.
Farm Bureau complains of the fact that the plaintiffs were permitted to elicit through the testimony of Mrs. Todd that the plaintiffs had agreed that the jury could bring in one verdict for all plaintiffs and that the plaintiffs would divide the damage award equally. It is contended that this testimony was irrelevant and prejudiced the jury regarding a matter which was solely within the province of the court, namely instructing the jury as to what plaintiffs, if any, are entitled to recover damages, if any.
Plaintiffs rely upon the procedural bar that Farm Bureau waived any objections as to the substance of the agreement by their failure to make a timely objection. Jones v. Wolford, 215 So.2d 240 (Miss. 1968), states that an objection to evidence comes too late when it comes after the evidence has been admitted without objection. Id. at 242.
We conclude that the trial court properly overruled Farm Bureau's motion to exclude evidence regarding any agreement by the plaintiffs to divide the proceeds of the jury verdict on the ground that the jury had taken, and is presumed to have followed, an oath promising to follow the law embodied in the jury instructions.
Furthermore, if the admission of this testimony into evidence was error, it was harmless error.
In summary, Farm Bureau acted in bad faith when:
(1) They denied any knowledge that Ballard and Mangum had a claim, at a time when their own general agent had told the men they had coverage;
*935 (2) They continued to deny this knowledge at the time their own state claims manager was stating in writing that the company would be hard pressed to explain this denial to a jury;
(3) They knew that their general agent had written numerous binders precisely like this, and they had accepted the premiums and never told the agent that no coverage or very limited coverage was provided;
(4) They accepted such binders leading their general agent to believe and act upon the belief that Ballard and Mangum could be covered, when, if the general agent had been properly informed by the company of their position on such binders, he would not have so informed these insureds and they could have sought coverage elsewhere;
(5) The company continued to contend that there was no insurable interest even after being informed by their general counsel that this was not true;
(6) By the company's own admission, they did little, if anything, to investigate the fire claim so that without reasonable explanation or excuse some nine months expired before the company responded to the claim;
(7) The company misled and misinformed counsel for the insured as to who was doing the investigation for the company and as to the extent of the progress of that investigation;
(8) Through their general agent, the company allowed Mrs. Todd to believe that she was afforded coverage under the binder after she openly and frankly explained the facts to the general agent at a time when, if properly informed, he could have correctly explained to Mrs. Todd or any of the insureds what coverage would be afforded and when it would take effect.
Such conduct on the part of the insurance supplier without legitimate excuse or arguable reason amounts to bad faith sufficient to trigger the punitive action of the jury. Insurance consumers in Mississippi are entitled to protection from such practices, and here that protection was provided at the hands of the jury.
The judgment of $25,000.00 actual damages, and $250,000.00 punitive damages is, therefore, affirmed.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.
WALKER, P.J., not participating.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
In my view the petition for rehearing should be sustained, the case reversed and rendered as to Ballard and Mangum on punitive damages, and remanded on the issue of whether they were insured by the Mississippi Farm Bureau Mutual Insurance Company binder; and as to the Todds, the case should be reversed and remanded on actual damages, and leaving open whether in one particular instance the insurance company may have subjected itself to a punitive damages issue because of a letter written by one of its officers to the attorney for the Todds.

FACTS
In 1981 Dr. James S. Mangum, a dentist sixty years of age, had been practicing in Fayette for approximately 15 years. He also invested in local real estate. Charles E. Ballard, a retired county supervisor with the Jefferson County Farmers Home Administration, at Dr. Mangum's suggestion, rented an office from him, where Ballard engaged in business as a realtor. Ballard also invested in local real property.
In November, 1980, Mangum purchased a dwelling house on one acre situated in a rural area approximately twenty-three miles east of Fayette for $6,000.00. A few days later he conveyed an undivided one-half interest to Ballard. When the property was sold to Mangum, there was an outstanding deed of trust in favor of Farmers Home Administration (FmHA) to secure an indebtedness of approximately $10,000.00. *936 Neither Mangum nor Ballard assumed the indebtedness, however. Mangum and Ballard made approximately $4,500.00 in repairs on the house. They thus had a cash outlay of approximately $10,200.00 to $10,500.00 in the property.
On January 27, 1981, John W. and Gloria C. Todd, a black couple, lived several miles south of Fayette in a house trailer. He was in his 70's and disabled with a stroke. She was thirty-six years old, and looked after the couple's affairs. They had three small children, three, four and six years of age. On that date Mangum executed a printed FmHA form three-month option for the Todds to purchase this realty for the total purchase price of $24,200, the entire amount to be financed through the FmHA. The consideration for the option was $1.00. Paragraph 9 of the option states the following:
9. Loss or damage to the property by fire or from an act of God shall be at the risk of the Seller until the deed to the Buyer has been recorded, and in the event such loss or damage occurs, the Buyer may, without liability, refuse to accept conveyance of title, or he may elect to accept conveyance of title, in which case there shall be an equitable adjustment of the purchase price.
The Southeastern Fire Insurance Company of Charlotte, North Carolina, had a fire policy in effect on the house for $16,000.00 through its local agent, J.L. Adams in Gloster, Mississippi, effective November 7, 1980, through November 7, 1981. The policy was cancelled April 15, 1981, however, because the house was vacant. Ballard was notified at some time prior to the cancellation date that the policy would be cancelled.
On April 14, 1981, Gloria Todd went to the office of Ralph Frizzell, local agent for Mississippi Farm Bureau Mutual Insurance Company (MFBM), to secure an insurance binder on the house. On that date Frizzell issued a MFBM binder to Gloria Todd for the period 14 April 1981 through 14 May 1981, for $25,000.00 on a "one-story, frame, one-owner dwelling," with mortgage or loss payable clause to "United States of America  Farmers Home Administration, Fayette, MS. 39069." She paid an annual premium of $270.46 that day.
Either the day, or a day or two prior to going to Frizzell's office, Gloria Todd had asked Ballard for permission to move some of their personal property in the dwelling. Ballard told her she would need an insurance binder.
The Todds moved some linens, silverware and dishes in the house. On Sunday, April 26, and one day before the option would have terminated, the house burned, resulting in a total loss.
The fire was reported to MFBM and on April 28 Ken Bossier, a claims representative for Jefferson County, investigated the fire, took pictures, and filled in a notice of loss form, and made a handwritten report to Joseph T. Bacon, MFBM claims supervisor for 17 Mississippi counties.
The report attached photos of the burned house, and a copy of the option, noting Paragraph 9 of the option to the effect that the seller was responsible for insurance. Bossier reported that the house had burned before the deal was closed, and that he had told Ballard that he felt MFBM would not owe for the loss since the Todds had no insurable interest.
Bossier also reported that Ballard had told him that when Frizzell wrote the binder that he had his policy cancelled with his insurance company on April 15, 1981. When Ballard talked with Bossier, Ballard was under the impression that his insurance carrier was Bituminous Casualty, but it was later learned that this was incorrect, that the policy was with Southeastern. Ballard did inform Bossier that he and James S. Mangum owned the property.
On May 5, 1981, Bossier sent a non-waiver form, signed by John and Gloria Todd, and recorded statements of John Todd and Frizzell to Bacon. In this recorded statement Frizzell said Ballard had called him about a week prior to April 14 informing him that the Todds would be by for a binder. Frizzell said only Gloria Todd *937 came in and told him she wanted whatever FmHA required to process the loan. Frizzell said Ballard reported the fire on Monday, April 27, and he asked Ballard if the Todds had started moving in, and Ballard replied that they had started moving in Saturday before the house burned on Sunday. In the recorded statement Frizzell said that he had driven past the house a couple of times and that Ballard had indicated the Todds would move in before closing date. He said Ballard wanted this because he did not want the house to stay vacant any longer than necessary. Frizzell called Ballard and asked when the Todds were going to move and Ballard replied they would start moving in Friday the 24th. However, Frizzell went by the house on that Friday, and saw no evidence that anyone had started moving in.
Frizzell also said that all Ballard said to him prior to Gloria Todd coming by to get the binder was that they would be by to get the binder.
In this statement Frizzell said that when Ballard came by following the fire, it was pointed out to him that the option provided that until the deed was recorded any fire would be the seller's loss.
On May 6, 1981, Bossier sent another handwritten report to Bacon, enclosing a recorded statement of Gloria Todd. The report also set out the need to obtain information about the other insurance policy which had been carried by Mangum and Ballard through the Adams Insurance Agency. Bossier reported that Ballard told him that Todd made no deposit for the house, and everyone was simply waiting on the FmHA to close the loan. Bossier reported the local FmHA supervisor James Taylor advised him the money finally came in on April 28.
On April 13 Bossier sent another handwritten report to Bacon. He said he had checked again with James Taylor who told him he had gotten a letter from the Adams Insurance Agency, but that Taylor got hostile and would not give him a copy of the letter or tell him its content. He reported that Taylor was upset and told him that he would have to have a subpoena and that since Farm Bureau wrote a binder on the property they would owe for it and that if Farm Bureau would not pay this loss the FmHA would not grant a loan to anyone who wanted MFBM insurance on their property.
Another agent of MFBM went to the Adams Insurance Agency where he secured the information that the policy had been cancelled April 15, 1981, but the agency would give him no other information.
On May 18, F.E. Magill, state claims manager for MFBM, wrote a handwritten note to another official:
Preston,
Technically there is of course no coverage.
What concerns me is that the agent, although he acted improperly and in excess of his authority, did exactly what he intended; he bound coverage on a dwelling that the insured did not own nor had incurred any obligation to any mortgagee. With the agent doing exactly what he intended to do he would be hard pressed to explain no coverage to a jury in Claiborne County.
This matter may or may not be pressed by Insured or some other interested party. Just in case I think it should be reported as an E & O claim.
Do you agree?
 s/F.E. Magill
On May 21 Magill wrote Walter J. Duncan, MFBM vice president, enclosing a copy of their file. The letter reported the local agent, having been given no misleading information, had issued a binder, and that after its issuance the owner had cancelled his policy with another insurance carrier. Magill related the agent clearly exceeded his authority. He concluded that while no issue had been made, since the house was a total loss "things will begin to stir."
On May 26 Bossier again sent a handwritten note to Bacon that he had contacted Ballard for a copy of any correspondence regarding his other insurance. He learned from Ballard that the carrier was *938 Southeastern Insurance Company rather than Bituminous. He also reported the deed record ownership of the property.
At some time following the fire Ballard contacted Harry L. Corban, a local attorney who would have handled the loan closing, about the loss. On June 30, 1981, Corban wrote a letter to the Mississippi Farm Bureau Casualty Life Insurance Company in Jackson relative to its binder No. 40415 on Gloria Todd.
This letter contained the following statements:
This letter is written on behalf of Gloria Todd, insured under your binder No. 40415, issued April 14, 1981.
* * * * * *
This letter is written by the undersigned as Attorney for the insured and for other parties in interest to request immediate payment benefits due under the terms of said binder.
A copy of this letter is being forwarded to your local agent for his file.
On July 6 Magill wrote Corban that handling the matter had been referred to "Inax Underwriters Agency, Inc., in Chicago. They have assured me that either a claims representative or an attorney representing the company will be in contact with you within the next week or ten days."[1]
Frizzell's insurance carrier in fact was INAPRO, Inc., of New York City. This firm wrote Frizzell on July 8 about his coverage, and that the law firm of "William & Goodman" had been assigned for his defense.[2]
On July 31 Magill wrote Ronald B. Stewart, vice-president of INAPRO, acknowledging receipt of a copy of his letter to Frizzell.
On August 13 Corban again wrote MFBM, acknowledging receipt of Magill's July 6 letter and demanding action, and on August 19 Magill wrote Stewart enclosing a copy of this letter and telling him he was advising Corban that INAPRO was handling this matter. Magill wrote Corban August 20 telling him the entire matter was being handled by another company. The letter also stated:
You should direct all of your correspondence on this matter to a Mr. Ronald B. Stewart, Vice-President, INAPRO, Inc., 1185 Avenue of Americas, 26th Floor, New York, New York 10036. In your correspondence, you should refer to their file number 519-L-102014-0, policy number E01000134.
Hopefully, your contact at this office will expedite this matter for you and your client.
Corban wrote Magill August 24 acknowledging receipt of his letter and complaining that no action had been taken. He also informed Magill his clients were looking to the Farm Bureau Casualty for payment since that company had issued the binder. On that same date Corban also wrote Stewart asking for his immediate attention.
On September 18 Magill dictated a file memorandum, relating first his efforts to talk with INAPRO claims people who would be responsible for handling the matter in New York, and finally getting Mike Metrovich, who told him that the matter had been referred to Watkins and Eager, with very little action having been taken by that firm. Metrovich further informed him he had referred the matter to their Jackson office.
Magill's memo further related he had received a call from Claude Skelton, an attorney with the U.S. Department of Agriculture. Skelton informed him the check for the loan had never been delivered by the local FmHA office, and that they had a loan through a prior owner. Skelton contended this gave FmHA at least an equitable interest in any insurance proceeds that might be paid, and threatened a lawsuit at an early date. Metrovich had been informed of this fact, and promised to call *939 Skelton and ask for additional time. The memo concluded:
It does appear that this matter has been dragging quite badly but hopefully the ball has starting [sic] rolling. One day this week I will call the local I.N.A. office here in Jackson in attempt to see who might be handling this matter for the local Company and see what I can do to prompt them along.
Beneath was the following handwritten notation:
9-17-81
Since dictating this memo I received a call from Atty Corban re some action. Told him I.N.A. was handling.
There was another handwritten notation in the file stating: "I.N.A. says they have opinion from Jim Carroll insurable interest did exist."
On September 28 Bacon wrote Greg Copeland with the law firm Heidelberg, Woodliff and Franks, enclosing a copy of the complete file, and requesting an opinion as to whether Todd had an insurable interest in the property.
On October 16 John B. MacNeill of the firm responded in a four-page letter concluding that the Todds had an insurable interest, but only to the extent they paid for the option. This opinion was bolstered by the language of the option reciting that the risk of loss did not pass until the deed was actually recorded, and not only had no deed been recorded, but the loan was never closed. He recommended the company tender the actual amount paid for the option and refund the premium to the Todds' attorney along with an explanation why this amount was being paid. A suggested letter was enclosed.
In the meantime Corban wrote Magill on October 13 enclosing a copy of a letter to Bill Lumpkin, local claims representative for I.N.A. Corban's letter to Lumpkin was a three-page recitation, which contained the following pertinent paragraphs:
It was the understanding by all parties that the house was totally covered by the binder against all loss by fire-extended coverage.
Mrs. Todd and other parties in interest have been pushing me to bring this to a conclusion and frankly, I am very disturbed that apparently Farm Bureau has neglected this claim.
As I told you by telephone, our client is looking to Mississippi Farm Bureau Insurance Company for payment and is not concerned with any difficulties which may arise between their local agent and the insurance company.
The fact remains that Gloria Todd paid for and received a binder from Farm Bureau and invested a considerable sum of money in repairs to the residence and was acting in good faith when the insurance was purchased and feel she has a valid and binding contract with Mississippi Farm Bureau Insurance Company.
Eventually I am sure Farm Bureau will hear from attorneys representing Farmers Home Administration, but as you are well aware, there is often a considerable delay when governmental agencies are involved.
* * * * * *
Again, let me state that while our clients are releasing no one from liability, they are not concerned over any dispute or argument between Mississippi Farm Bureau and their local agent, Mr. Ralph Frizzell.
On November 2, Bacon wrote Corban informing him Farm Bureau had concluded the "Todds may have an insurable interest in the dwelling which burned, but only to the extent of their actual pecuniary loss." In view of this, he stated MFBM was ready to indemnify them for the loss. He asked for documentary evidence of the amount paid for the option, and a complete release and assignment for his clients' rights to MFBM, after which a check would be promptly mailed to Corban. The letter also stated the release would have to be a complete release of MFBM by the Todds, the mortgagee and any other persons with any interest in the property. Bacon informed Corban it would be impossible for the *940 Todds to have suffered any loss other than mentioned, since by the terms of the option the seller bore such loss until the deed was recorded.
On November 3 Bacon wrote Lumpkin:
I am writing this letter to confirm a conversation you and I had one day last week relative to your involvement in this matter.
In the course of our conversation, you informed me that for all practical purposes your company was not taking any action on this matter. You indicated to me that from your investigation that you had at this time that you did not consider that the agent had overstepped his binding authority and that there was claim under the E & O policy.
In view of your position, we are going ahead and trying to attempt to work out a settlement of this matter with Mr. Corban and his clients, John and Gloria Todd. In the event that we are successful in working out a settlement in this matter, we will be looking directly to you and your company for reimbursement for any and all amounts paid by this Company.
On December 30 a declaration was filed in the Jefferson County circuit court by John W. and Gloria C. Todd, James S. Mangum and C.E. Ballard as plaintiffs against Mississippi Farm Bureau Casualty Insurance Company.
Interrogatories to the plaintiffs were answered May 19. Number 8 is as follows:
INTERROGATORY # 8: With respect to the allegations contained in Paragraph 7 of the Declaration, state the following:
a. The names and addresses of all people who discussed with Ralph Frizzell concerning insurance coverage on the subject premises.
Answer: a. Mr. Ballard and Mrs. Todd.
b. The date on which each conversation or discussion took place.
Answer: b. 4/14/81 was the only time by Mrs. Todd, and 4/14/81 and 4/27/81 were the only two times by Mr. Ballard.
c. The detailed substance of each such conversation or discussion:
Answer: c. The conversation was to the effect that the parties and the house were covered.
d. The nature and amount of insurance coverage allegedly bound by such conversation.
Answer: d. Fire and extended coverage in the amount of $25,000.
e. The named insured or insureds in whose name the alleged coverage was bound; and
f. The effective dates of coverage which was [sic] so bound.
Answer: e. Mrs. Todd, but should have been Mr. and Mrs. Todd, Mr. Mangum, Mr. Ballard and Farmers Home Administration.
f. 4/14/81.
An amended complaint was filed June 3, 1982, adding Frizzell as a party defendant. Both complaints asked for $25,000.00 actual and $250,000.00 punitive damages. The amended complaint also added a second count naming the Insurance Company of North America as a party defendant to determine whether it was the carrier for Frizzell.
The amended complaint alleged the issuance of the binder to Mrs. Todd, and then inserted the following paragraphs, not in the original:
9. Then, Mrs. Todd went to Mr. Ballard and told him that she had procured insurance on the house with Mr. Frizzell. Mr. Ballard, being concerned about having fire and extended coverage on the house, and not being able to see the binder, personally called the Defendant, Mr. Frizzell, and asked him the question of whether he and Dr. Mangum were covered by the fire and extended insurance coverage that he had issued to Mrs. Todd. Mr. Ballard was told by Mr. Frizzell that the house was covered, that he had nothing to worry about, and that he and Dr. Mangum were covered.
On October 13, 1982, the plaintiffs took a voluntary nonsuit against Frizzell. Trial began that day. Corban testified for the *941 plaintiffs, and Frizzell was called as an adverse witness. He testified it was common practice to issue a binder to an FmHA applicant for a loan, with an option to purchase the property. In Gloria Todd's application he had recited she was the owner, when he knew she was not. He further testified no one but Mrs. Todd made an application for insurance or paid a premium. He admitted he may have told Ballard the house was covered. He did not testify, however, nor was he asked if he told Ballard that he and Mangum were covered. Gloria Todd, Ballard and Mangum testified.
Plaintiffs' counsel consistently asked Gloria Todd highly leading questions, suggesting she is a woman of limited education and acuity. Todd acknowledged she only paid a dollar for the option, and that the insurance premium had been refunded. She said Ballard informed her she could move into the house when she took out insurance.
Ballard testified the reason he asked Gloria Todd to get insurance was because "we didn't want to go without some insurance on it." He said he called Frizzell to make sure he and Mangum were covered along with Mrs. Todd. Ballard also testified as follows:
Q. That's what I mean. Tell us the substance of that conversation.
A. Well, I asked Mr. Frizzell, I said, "Now, she's come in and wants the key to the house, and it's all right with us provided we have insurance." And I said, "I want to be sure that Mangum and Ballard has insurance along with Mrs. Todd." And he said, "You've got insurance," said, "Don't worry about it." He said, "It is insured." That's the words he said.
Q. Now, let me ask you this: if he had told you instead of what he told you, if he had told you Mrs. Todd is the only one that has insurance in this thing, what would you have done?
A. Well, I would have immediately said, "Buddy, you put our name on there and make it out in our name then instead of Mrs. Todd." But see, I believed what he said, and it wasn't any point in me doing that. [Emphasis added]
* * * * * *
Q. What was the phrase you said he used about worrying, what did he say?
A. He said, "You all are covered and you have insurance on the house and don't worry about it," something to that effect.
Q. All right. Now, after the next day after the 15th, what happened to your insurance coverage in Gloster?
A. They cancelled on the 15th like we'd agreed.
Ballard conceded he never filed an application, never paid a premium, and no binder was ever issued to either him or Mangum. He testified he never filed any claim form of any kind with MFBM after the loss. He stated Corban was acting on his behalf. He also conceded he had never said anything to anybody, including Bossier, about his name not being on the binder.
Bacon was called as an adverse witness on behalf of the plaintiffs. Joe Harper, in the underwriting department of MFBM, was also called as an adverse witness.
Over the objection of MFBM, its financial statement for 1981 was introduced into evidence, showing a net worth of $14,161,081.
The plaintiffs then rested and MFBM moved for a directed verdict, which was overruled.
MFBM then rested. The circuit judge granted an instruction peremptorily instructing the jury to bring in a verdict "for all of the plaintiffs" for $25,000.00 actual damages. The case was submitted to the jury on punitive damages resulting in a verdict for plaintiffs in the amount of $25,000.00 actual and $250,000.00 punitive damages.

ISSUES
All of the problems in this case arising from the issuance of the April 14, 1981, binder are attributable to two men, Frizzell and Ballard.
In the first place Frizzell had no business issuing an insurance binder to Gloria Todd *942 giving her $25,000 coverage that date. He should have known better. Indeed, the application he filled in stated Todd as the owner, thus misleading his own company.
If Ballard wanted Farm Bureau insurance to cover himself and Mangum, he should have gone to Frizzell, not sent an uneducated person to get insurance for them. Having sent her, however, at least he should have told her to bring him the binder. Also, if he meant for some coverage for himself and Mangum, why was it he did not pay one penny of the premium?
The entire problem can be laid to the feet of these two men, both of whom knew better than to conduct business as they did; Frizzell, the local agent for MFBM, and Ballard, a realtor and county supervisor with FmHA for over 25 years.
Frizzell made a mistake, and Ballard made a mistake. You will read this record in vain to glean precisely what was in either of their minds on April 14, 1981. Both their statements and conduct following the fire are disingenuous. All that is clear is that neither of them was properly attending to his business responsibility.

BALLARD
Let us begin with Ballard as we last see him, a witness in the case. What does he tell us as a witness? He tells us first that he sent Gloria Todd to get insurance. He knew his own policy was about to be cancelled the next day. This house, situated over 20 miles out in a rural area, had been long vacant. Then he testifies he called Frizzell and asked him if "Mangum and Ballard" had insurance along with Mrs. Todd. What does he say Frizzell told him? "You've got insurance and don't worry about it." Indeed, he claims to have thought that his and Mangum's names were on the binder instead of Gloria Todd. Frizzell told him, Ballard testifies as a witness." "You all are covered and you have insurance on the house and don't worry about it." [Emphasis added]
All this is Ballard as a witness on October 14, 1982, eighteen months after the fire.
If Frizzell had in fact said to Ballard what Ballard as a witness claimed he said, they were among the most important, significant, vital words Ballard ever heard in his life. They would have been etched, engraved in his cranium.
Yet when Bossier told him two days after the fire (and only two weeks after Frizzell supposedly had solemnly told him that "Mangum and Ballard" had insurance) that the Todds had no insurable interest and he did not think MFBM was liable for the fire, Ballard said nothing about Frizzell's representation to him. Why did he not tell Bossier, "Look here, Mrs. Todd may not have any insurance, but Mangum and I do because your local agent told me we had coverage."
Bossier talked to Ballard again on May 6 about the previous policy Ballard and Mangum had, and still Ballard told him nothing about Frizzell's solemn assurance.
Now, the reader may demur, all that is in the record about what Ballard told Bossier is in the latter's handwritten reports to Bacon. That is true, but if Ballard had told Bossier that Frizzell had represented to him that he and Mangum were covered under this binder, can anybody believe Bossier would have omitted information this critical from his in-house reports? But let us continue.
Ballard went to see his lawyer, Corban. Surely he would have told his attorney about this representation by Frizzell. Corban would have instantly recognized its utmost significance.
On June 30 Corban wrote Mississippi Farm Bureau Casualty with no hint of a suggestion in this letter about Frizzell's assurance. Corban, an experienced attorney, would have explicitly informed the MFBM that its own agent had solemnly assured his client Ballard that "Ballard and Mangum," the owners, had Farm Bureau insurance. Instead, the letter begins that it is written on behalf of Gloria Todd, insured. Further in the letter Corban tells MFBM the letter is written "for the insured and for other parties in interest." *943 Who are the "other parties in interest"? Why was Corban so coy? Why did he not say, "we take the position Ballard and Mangum were insured because of the solemn representation of your own agent"? If Ballard had told Corban about Frizzell's assurance, can anybody believe Corban would have said nothing about it in this letter?
Corban wrote again on August 15, August 24 and October 13, but never does he name Ballard and Mangum as claimants. The most we ever learn about these two gentlemen in Corban's letters is the unnecessarily mysterious allusion to "other parties in interest."
Neither Ballard nor Mangum ever filed a claim on their own behalf. The record does not reveal either ever paying or offering to pay a penny on the premium.
On July 6 Magill wrote Corban another company would be in contact with him. By then Corban had long since known his clients, Ballard's and Mangum's names, were not on the binder. Corban also knew the problem started with Frizzell. Did he ever make any demand on Frizzell? No.
In fact, on August 20, Magill wrote Corban telling him the name and address of the person and company he should write about his claim.
On October 13, Corban wrote Frizzell's insurance carrier, I.N.A., a three-page letter. When he wrote this letter, Corban knew:
(1) Neither Ballard's nor Mangum's name was on the binder;
(2) The reason neither of their names was on the binder was that Frizzell had not put their names on it;
(3) MFBM had not paid the claim, and there was some question as to whether MFBM even owed his clients Ballard and Mangum.

And, if we are to believe Ballard as a witness, Corban also knew when he wrote I.N.A. that Frizzell had told his client Ballard a bald face lie when he said his and Mangum's names were on the binder.
Did he say in his three-page letter to I.N.A., "Look I want you to know your assured Frizzell specifically told my clients Ballard and Mangum that they were covered and not to worry about having insurance"? Did he say, "If Farm Bureau is not liable, I am specifically holding you responsible because of your assured's representation?
No. While Corban recognized that MFBM insurance and I.N.A. might be in conflict, his letter never indicated it was in any other context than the error caused by Frizzell issuing a binder to Todd when she had no insurable interest. The conflict was as to whether or not Todd was insured, and not Ballard and Mangum.
When the declaration was filed on December 30, there was no allegation that Frizzell had specifically told Ballard that he and Mangum had insurance.
Interrogatory Number 8(a) asks the plaintiffs the names and addresses of all people who discussed with Ralph Frizzell concerning insurance, and 8(c) the detailed substance of each such conversation or discussion. What did the plaintiffs answer under oath on May 19, 1982? The only parties who talked with Frizzell were "Mr. Ballard and Mrs. Todd." What about 8(c)? What an appropriate time for Ballard to come forward and tell, "I told Frizzell that I wanted to be sure that Mangum and Ballard have insurance along with Mrs. Todd," and he replied, `You've got insurance. Don't worry about it. You are all covered and don't worry about it.'" This is what Ballard as a witness testified in October.
But what did the plaintiffs answer May 19, 1982, to 8(c): "The conversation was to the effect the parties and the house were covered."
The application for insurance was signed for John and Gloria Todd. The binder was to Gloria Todd, and FmHA as mortgagee. There is nothing in this answer to clue anybody that Frizzell meant Ballard and Mangum when he allegedly said, in effect, "the parties" were "covered."
*944 Never in the history of litigation did a question so pregnant with possibilities for reply give birth to an answer so anemic as 8(c), if we are to take what Ballard testified at trial was true.
In no letter did Corban name Ballard or Mangum as possible claimants. The best he ever did on this score was the enigmatic allusion to "other parties in interest."
With this background is there any member of this Court who can seriously believe Ballard's testimony that Frizzell specifically told him that "Ballard's and Mangum's" names were on the binder, and that the two of them were also covered?
Until the complaint was amended on June 3, 1982, there is not one word in this record to indicate the plaintiffs were claiming Frizzell had told Ballard that he and Mangum had insurance. And indeed, even with this allegation in an unsworn complaint why should the defendant put any credence in it, when only two weeks previous the plaintiffs' sworn answer to the interrogatories made no mention of such representation.
No. The first time MFBM could have seriously entertained the notion that such a contention would be made was when Ballard sat in a witness chair October 14, 1982.

BALLARD AND MANGUM BAD FAITH CLAIM
A brief analysis will dispose any possible claim of Ballard and Mangum of bad faith. Every insurance case of bad faith involves the dealings between an insurance company and its insured. See: Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1986); National Life & Accident Ins. Co. v. Miller, 484 So.2d 329 (Miss. 1985); State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242 (Miss. 1985); Blue Cross & Blue Shield of Miss. v. Campbell, 466 So.2d 833 (Miss. 1984); Reserve Life Ins. Co., et al. v. McGee, 444 So.2d 803 (Miss. 1983). A necessary ingredient of a bad faith claim is the undisputed existence of some contract between the insurance company and its insured. The bad faith claim from whether the insurance company violated a duty owed under an insurance contract, but the existence of the contract with the plaintiff is never in dispute in such case. There can be no bad faith claim between an insurance company and third parties. See: Dickey v. Alabama Farm Bureau Mut. Ins. Co., 447 So.2d 693, 694 (Ala. 1984); Stewart v. State Farm Ins. Co., 447 So.2d 693, 694 (Ala. 1984); Metropolitan Life Ins. Co. v. McLarson, 467 So.2d 277, 280 (Fla. 1985); and 15A Couch on Insurance, § 58A (2d ed. 1983). Here the question was whether Ballard and Mangum ever became insured for $25,000 because of an alleged oral agreement made by Frizzell with Ballard, whether there ever was a contract between them or not. Is the insurance company bound by good faith standards in contesting whether there was in fact such an agreement, and if so, whether it was legally binding upon MFBM? Can we say MFBM was not entitled to vigorously contest in court the birth of any binding contract between it and these two? That somehow or another it violated a good faith standard to contest this in court? Of course not.
MFBM was entitled to contest any such claim to the same extent of any other claim made by third parties. It owed Ballard and Mangum no affirmative duty to admit a contract existed. If we hold otherwise, we have gone far afield.
To assert Ballard and Mangum could ever have some sort of punitive damages claim against MFBM for contesting their claim under the facts of this case is strange reasoning, in my view.

THE TODDS BAD FAITH CLAIM
The factual developments in this case have been detailed in order to understand the situation in which MFBM found itself, and the reasonableness of its action.
A fire was reported on a home covered by an interim binder. Two days after the fire a claims representative was on the scene investigating the fire and questioning the parties.
*945 What did he find? The person insured had an investment of $1, and an option which put all risk of loss by fire on the seller. Did this option create an insurable interest?
There are all kinds of options, some in which the insurable interest would be apparent. For example, an option coupled with a substantial payment on the purchase price; and another, an option giving a right to buy a building at a purchase price considerably less than its actual worth.
Such was not the case here. Todd had no insurance whatever on her personal property in the house, and never claimed any. Her sole insurance was on the building. There was no proof the house was worth a penny more than her option price. All she and her husband lost was the opportunity to buy this particular house. There is nothing in the record to suggest the Todds did not find another house just as satisfactory as the one on which they had this option.
MFBM knew, of course, almost immediately after the fire that its agent Frizzell had done something wrong. It knew there could be liability of some kind somewhere. But, how can bad faith be attributed to MFBM for questioning whether there was an insurable interest in the Todds, for balking at issuing a check to them for $25,000? MFBM never denied there was a binder. Surely, surely an insurance company in a dubious case has a right at any time to raise the question of whether there was an insurable interest without the Damocles sword of bad faith hanging over it by so doing. See: Southeastern Fidelity Ins. Co. v. Gann, 340 So.2d 429 (Miss. 1976); Gerard v. Metropolitan Life Ins. Co., 167 Miss. 107, 149 So. 793 (1933). A contract otherwise binding is void if there was no insurable interest, not as contract law, but public policy. "Such policies have a tendency to create a desire for the event." Gerard v. Metropolitan Life, supra.
As stated, MFBM, recognizing some responsibility lay somewhere for what Frizzell did, even though it might not be legally bound by the binder, called upon Frizzell's errors and omissions carrier to investigate the claim. Corban was informed of this.
Contrary to any contention to the contrary, the facts of this case show a diligent investigation by MFBM, and a responsible response to Corban's claim.
I cannot see how a bad faith claim can be generated, nor can I fault MFBM for having the opinion there was no insurable interest in the Todds. Nevertheless, even though it considered itself to have no liability, the record shows MFBM prodded Frizzell's carrier, without success, to take some action. Also, as above set forth, until the declaration was filed, no claim was made by Ballard or Mangum.
An element of bad faith did eventually arise in reference to the Todds, however, in November, 1981. It arose as follows:
At the bottom of the September 18 memo which Magill dictated for the file he wrote that I.N.A. said they had an opinion from Jim Carroll that an insurable interest did exist. Carroll was an attorney in the Watkins and Eager law firm, and represented I.N.A. and Frizzell in the circuit court proceedings until a nonsuit as taken as to Frizzell.
The record shows that following receipt of this information, on September 28 Bacon wrote the law firm of Heidelberg, Woodliff and Franks for an opinion as to whether Todd had an insurable interest. At this point MFBM had acted responsibly and well within its rights.
On October 16, that law firm responded that Todd had an insurable interest but only to the extent of the amount paid for the option. MFBM thus secured an independent opinion from a reputable law firm. Moreover, this opinion was correct, in my view. See: Harrison v. American Motorists Ins. Co., 245 So.2d 577 (Miss. 1971). The letter recommended that MFBM tender the actual amount paid for the option, and the attorney even enclosed a suggested letter.
Thus, when Bacon got the reply he was advised by competent counsel that the Todds were indeed insured, although in a *946 small sum, and MFBM thereby became obligated to deal with them in good faith, and to handle their claim in good faith.
Bacon essentially followed the suggested letter except in one significant particular. He predicated payment to the Todds of their actual loss upon receipt by MFBM of a release not only by the Todds, but also the mortgagee and any other persons with interest in the property. Bacon's November 2 letter to Coran states:
If you will furnish this office with documentary evidence of the amount paid for the option to purchase, with a full and complete release and a full and complete assignment of your clients' rights to this Company a check will be promptly forwarded to you. The release will have to be a full and complete release of this Company from any further obligation to the Todds, any mortgagee, and any other persons with any interest in this property. [Emphasis added]
Bacon had no right to demand anything further than a release by the Todds. The Todds could not secure a release from any other parties, or indemnify MFBM from any such claims, nor were they obligated to do so in order to be paid their actual loss. This had the appearance of bad faith on the part of Bacon. There was no legitimate or arguable reason for him to put any such requirement on the Todds in order to be paid what was due them. See: 15A Couch on Insurance, § 56:6, 59:29 (2d ed. 1983).

TODDS CLAIM FOR ACTUAL DAMAGES
The Todds claim for actual damages is minimal. As noted, they had no contents coverage. That their claim is minimal should be obvious. The majority bases its decision they are entitled to the full amount under Miss. Code Ann. § 83-13-5 (1972) commonly referred to as the "Valued Policy Statute." This statute could only come into play, however, when the insurance company attempts to maintain the property destroyed was worth less than the coverage. MFBM made no such contention in this case. It did question the Todds being damaged $25,000. This was correct. See: Alabama Farm Bureau Mut. Ins. Service v. Nixon, 268 Ala. 271, 105 So.2d 643, 646 (1958); Century Corp. v. Phoenix of Hartford, 157 Mont. 16, 482 P.2d 1020, 1023 (1971); Higgins v. Ins. Co. of N. America, 256 Or. 151, 469 P.2d 766, 774, 66 A.L.R.3d 871 (1970); Milhouse v. Globe & Rutgers Fire Ins. Co., 161 S.C. 96, 159 S.E. 506 (1931); First Preferred Ins. Co. v. Bell, 587 S.W.2d 798, 803 (Tex.Civ. App. 1979); Harrison v. American Motorist Ins. Co., supra; L.R.A. 1918A 363; 44 C.J.S. Insurance, § 188, p. 887.

CONCLUSION
Ballard and Mangum may have made a jury issue, barely, on whether there was an oral representation by Frizzell that they had insurance coverage, and whether this created an insurance contract between them and MFBM. As noted above, it stretches credulity to the breaking point to believe he made such assurance. Moreover, if he did so, their taking a voluntary nonsuit as to him was manifestly strange.
I would therefore reverse and remand this case to give the Todds the opportunity to prove their actual damages, and pursue a bad faith or punitive damages claim restricted solely to Bacon's letter to Corban on November 2, 1981.
As to Ballard and Mangum, I would reverse and render as to any punitive damages claim by them, but remand for retrial to determine whether MFBM was legally obligated to pay them anything because of Frizzell's conduct.
In a punitive damages case, our function is not limited to simple appellate review. A punitive damage award is a public issue, because not merely the parties, but the interest of society is involved. In Blue Cross & Blue Shield v. Campbell, 466 So.2d 833, 842 (Miss. 1984), we stated:
In a punitive damages case, it is the responsibility and function of the trial judge, after reviewing all the evidence to first determine whether the facts of that particular case justify submitting to the *947 jury the issue of such punitive or special damages. In such a case the trial court is not guided by the simply rules of Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652 (Miss. 1975), considering only one side's evidence, but rather must consider all the evidence and determine if the defendant's conduct was such that the jury should be called upon in turn to decide the justification and amount of punitive damages, or some extraordinary damages.
Upon appeal, it is also the function of this Court to determine from all the evidence whether punitive damages was a proper jury issue. And, in determining the propriety of the trial judge's submission of such issue to the jury, we are not confined to the parameters of Paymaster.

We have in certain cases set forth instances and types of conduct which justify submitting a punitive damage issue to the jury. See: Fedders Corp. v. Ross Boatright, Jr. and Mary Boatright, 493 So.2d 301 (1986); Bankers Life & Casualty Co. v. Crenshaw, supra; National Life & Accident Ins. Co. v. Miller, supra; State Farm Fire & Casualty Co. v. Simpson, supra; Reserve Life Ins. Co., et al. v. McGee, supra.
The only conduct in this case which meets any cited criterion was Bacon's November 2, 1981, letter to Corban. To hold, as the majority does, that this is a punitive damages case (except on this one narrow issue restricted solely to the Todds) will, I fear, convey to the public that any claim against an insurance company carries with it also a claim for punitive damages. And, as I stated in the dissent in Employers Mutual Casualty Co. v. Tompkins, 490 So.2d 897, 490 (Miss. 1986), such an announced principle of law will surely be of short duration. See also: Bankers Life & Casualty Co. v. Crenshaw, supra.
I must finally conclude that the one party in this case which indisputably was covered by the binder and which did have an insurable interest was the Farmers Home Administration. It never sued. Under the majority opinion the Todds who lost only $1, and Ballard and Mangum, who lost at most $10,500, will be paid the full $25,000 in actual damages, thus imposing upon ratepayers a $14,499 excess. The taxpayers of the United States will bear the burden of paying the loss to the Farmers Home Administration.
I therefore respectfully dissent.
NOTES
[1] Magill had been informed that Inax Underwriters was Frizzell's errors and omissions liability insurance carrier.
[2] INAPRO probably meant William Goodman of the law firm Watkins and Eager. A member of that firm did later represent Frizzell.