# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 91-CA-01124-SCT

*DIXIE INSURANCE COMPANY*

*v.*

*JAMES MOONEYHAN AND JEWELL MARIE MOONEYHAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/14/91 |
| TRIAL JUDGE: | HON. JOHN LESLIE HATCHER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | REBECCA LEE WIGGS |
| ATTORNEYS FOR APPELLEES: | DANA J. SWAN |
| | RALPH E. CHAPMAN |
| | C. KENT HANEY |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 3/7/96 |
| MOTION FOR REHEARING FILED: | 3/20/96 |
| MANDATE ISSUED: | 9/19/96 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

¶1. This case comes to us from a jury verdict and judgment of the Coahoma County Circuit Court in favor of James and Jewell Marie Mooneyhan ("the Mooneyhans") and against Dixie Insurance Company ("Dixie") for $542.00 in actual damages and $1,000,000.00 in punitive damages on a bad faith denial of a claim. Dixie's motions for new trial, JNOV or remittitur were denied. Thereafter, Dixie perfected this appeal.

¶2. Finding no reversible error as to actual damages, we affirm in part. However, we reverse and remand for new trial on the issue of punitive damages.

## PROCEDURAL HISTORY

¶3. This suit arose out of an automobile accident in which the Moonehans while driving their 1976 Dodge truck, which had been turned into a wrecker, were hit in the rear by an uninsured motorist. The truck sustained approximately $742.00 in damage; neither of the Mooneyhans were injured. On August 17,

1986, the Mooneyhans turned in an uninsured motorist claim for property damage through the Mitchell Company, Inc., ("Mitchell"), the agency which had procured their insurance with Dixie. Dixie subsequently denied the claim in December of 1986.

¶4. Initially, James Mooneyhan filed suit against Dixie, a Florida Corporation, Stonewall Insurance Company, John A. Williams and James L. Jones, in Coahoma County Circuit Court. Dixie's defense was that Mr. Mooneyhan had materially misrepresented the nature of the risk by seeking personal auto coverage on a commercial wrecker. Dixie counterclaimed alleging intentional misrepresentation and fraud on the part of the Mooneyhans and filed a cross-complaint seeking a declaratory judgment that the policy was void *ab initio* since they were not licensed in Mississippi to insure commercial vehicles. Dixie asked for $40,000.00 actual damages, $1,000,000.00 in punitive damages and Rule 11 sanctions against the Mooneyhans and their attorneys. Dixie did not pursue the claims of fraud and damages at trial.

¶5. A Petition to Remove to Federal Court was filed by Dixie and Stonewall on February 25, 1987. Subsequently Mitchell was added as a defendant and Dixie filed a cross-claim against Mitchell. The case was remanded to the Coahoma Circuit Court on February 4, 1988. Stonewall, Dixie, and Mitchell each filed Motions for Summary Judgment in January of 1988. These motions were denied almost two years later in an order filed December 21, 1990.

¶6. Trial began on August 7, 1991. During the course of the trial, the Mooneyhans dismissed defendants Stonewall Insurance, Williams and Jones and settled with Mitchell. Dixie then dismissed its cross-claim against Mitchell. The only remaining issues to go before the jury was whether Dixie wrongfully denied the Mooneyhans' claim and if so, whether punitive damages were warranted. The jury returned its verdict in favor of the Mooneyhans on August 9, 1991 and awarded them $542.00 in actual damages and $1,000,000.00 in punitive damages.

## STATEMENT OF FACTS

¶7. On August 10, 1984, Mooneyhan went to Mitchell in Clarksdale for the purpose of obtaining insurance coverage for his 1969 Dodge pickup which he had equipped with a wrecker bed. He used the wrecker in his business as a mechanic. Mooneyhan also used the truck for personal use. At Mitchell, Mooneyhan dealt with Annie Riley. Mooneyhan testified that he informed Riley that the 1969 Dodge was a wrecker and was used for business as well as personal purposes. This was evidenced by a sheet from a scratch pad taken from the agency's file on the Mooneyhans. On the scratch pad, Riley had written the words "69 Dodge wrecker" and made some computations as to the premiums. The computations correspond to those on the application filled out by Riley for the Moore Group, Inc., entitled "Mississippi Private Passenger Automobile Application." On that application Riley described the vehicle to be insured as a '69 Dodge pickup. There was no mention on the application of the truck being a wrecker. In fact, under the question, "Is any listed vehicle used in a business or newspaper delivery?" it was checked "no." Mooneyhan signed the application, but stated that Riley had him sign it and told him she would fill it out later.

¶8. The Mooneyhans did not specify what insurance company they wanted to deal with, but relied on Riley to select an insurance company for them. On June 24, 1986, Jewell Mooneyhan went to Mitchell to obtain insurance on a 1977 Mercury Marquis. Riley filled out an application for insurance with Dixie and switched the '69 Dodge to Dixie as well. The Dixie application reflected the '69 Dodge to be a pickup and under "Use of Car(s)", pleasure use was checked but business use was not. Mrs. Mooneyhan stated that the application had not been filled out at the time she signed it. Riley testified that she would have had to have

filled it out in Mrs. Mooneyhan's presence or she would not have known a lot of the information.

¶9. Riley testified that if she ever knew the '69 Dodge was a wrecker she had forgotten by the time the Dixie application was filled out in 1986. She stated that there was no reason for either her or Mooneyhan to intentionally misrepresent the fact that the truck was a wrecker because the premiums would be the same either way. The only difference was she would have used an insurance company other than Dixie because Dixie was not authorized in Mississippi to insure commercial vehicles. Riley testified she made a mistake. The policy the Mooneyhans received from Dixie was what is known as a plain language policy entitled "Your Family Car Policy."

¶10. On July 30, 1986, Mooneyhan notified Riley that he wanted the 1969 Dodge deleted from the insurance policy and a 1976 Dodge added. Riley filled out an endorsement requesting Dixie delete the '69 Dodge pickup from the Mooneyhans' policy and add a '76 Dodge pickup. There is no mention on the form that the '76 Dodge was a wrecker or that it was used for business purposes. The form did not require Mooneyhan's signature.

¶11. On August 15, 1986, the Mooneyhans were driving the '76 wrecker on a personal errand when they were hit in the rear by an uninsured motorist. The fact that the accident was not the Mooneyhans' fault was never in dispute.

¶12. Mooneyhan came by the offices of Mitchell on August 18, 1986, to report the accident and file a claim under his uninsured motorist coverage. Mooneyhan made no attempt to conceal the fact that the truck was a wrecker. In fact, he drove the wrecker to Mitchell's that day. Riley went outside to look at the damage to the truck and that is when she realized it was a wrecker and not just a pickup. James Maclin, a Mitchell stockholder, also went outside and saw that the truck was a wrecker. At that time he told Mooneyhan that insurance for a wrecker could not be written on the type of policy he had and immediately went inside and filled out an application for the wrecker with the Mississippi Automobile Insurance Plan. It was assigned to the Northland Insurance Company. The policy cost four dollars more a year than did the Dixie policy.

¶13. Maclin and Riley both testified that they did not discuss with Mooneyhan the probability of Dixie paying the claim. They went ahead and filed Mooneyhan's claim with Dixie and asked that the coverage be cancelled. The estimated damage to the truck was between $716 and $742. There was a $200 deductible. Mooneyhan ended up repairing the wrecker himself.

¶14. After receiving the claim and the estimates, Dixie's claims department investigated the claim. An adjuster telephoned Mooneyhan, Riley and Maclin and took recorded statements. In his statement and at trial Mooneyhan acknowledged that the damaged vehicle was a wrecker used in his business. He also stated that he told this to the agent at the time he applied for insurance.

¶15. The transcribed statements of Riley and Maclin showed their answers as being inaudible, but the adjuster's handwritten notes and Riley and Maclin's testimony at trial were consistent. Both Riley and Maclin stated that they did not know the '76 Dodge was a wrecker until they saw it themselves when Mooneyhan came in to report the claim. Dixie chose to believe its agents.

¶16. Dixie was advised by its attorney in a letter dated November 25, 1986, that if the facts in the claim file were accurate and the insurance application did not reflect the truck was a wrecker used for business purposes and if Dixie did not write policies for business vehicles then it probably did not owe the claim. The

letter also stated that Dixie would have to reimburse the Mooneyhan's premiums plus interest. In a letter to Mooneyhan dated December 29, 1986, Dixie denied the claim stating that it did not write policies for vehicles used for business purposes.

¶17. Roger Varner was the manager of processing operations at Dixie in 1986. He stated that when Dixie received the request that Mooneyhan's policy be cancelled they sent a check for the unused portion of the premium to Mitchell to return to Mooneyhan. After the claim was denied, another calculation was done and a check for approximately fifty-six dollars was sent to Mooneyhan. It was later discovered that a mistake had been made and so Mooneyhan was sent another check for forty dollars. All the checks totaled amounted to a full refund of the premiums paid by Mooneyhan plus 10 percent interest. Varner stated that if Dixie had known that the application for insurance was for a commercial wrecker Dixie never would have issued the policy because they were not legally authorized to write commercial policies in Mississippi.

¶18. At some point after the claim was denied and litigation had begun Mooneyhan's attorneys requested copies of everything in Mooneyhan's file kept by Mitchell. In it was found the sheet of scratch paper on which Riley had written "69 Dodge wrecker." It was not until that sheet of paper was found that Mitchell and Dixie became aware that Mooneyhan had in fact informed Riley that the '69 Dodge was a wrecker when he had obtained insurance with the Moore Group in 1984. After learning of this Dixie still refused the claim stating that there was still no evidence that Mitchell ever knew the '76 Dodge was also a wrecker and because they were not authorized to write policies for commercial vehicles.

¶19. It was the Mooneyhan's position that Dixie acted in bad faith and set out to deny the claim from the beginning. To support this, several letters and memos were put into evidence. One such memo from Bill Dibble, Dixie's Director of Claims, to Leo Daniel, Dixie's property damage supervisor, asking why in a November 19 letter to Dixie's attorney "we requested Ms. Saunders to give us a legal opinion as to whether we could deny coverage to our insured in this instance?" Daniel testified that it was Dixie's policy to find ways to legally pay claims. Attorney Saunders in her letter to Dixie stating that the claim should probably be denied asked, "When can I expect your substitute letter dated November 19, 1986." The letter dated November 19, 1986 that was produced in discovery asked Saunders to "review and advise us is there any way we can legally pay coverage to our insured." The Mooneyhans contended that this was the substitute letter and the word "deny" had been changed to "pay" in order to cover up Dixie's plan to deny the claim from the start.

<u>DISCUSSION OF ISSUES</u>

## I. IT IS REVERSIBLE ERROR FOR THE JURY TO HAVE CONSIDERED THE MITCHELL AGENCY'S REVISION OF THEIR SCRATCH SHEET, EXHIBIT P-34, WHICH WAS NEVER ADMITTED INTO EVIDENCE.

¶20. The central issue at trial was whether the Mitchell Agency knew the Mooneyhans' 1976 Dodge truck was a wrecker used for business purposes thereby imputing that knowledge to Dixie. In the Mitchell Agency's file on the Mooneyhans was a sheet of scratch paper with "69 Dodge wrecker" and calculations that corresponded with the premiums paid to the Moore Group in 1984 written in Annie Riley's handwriting. At some point, the attorneys for the Mooneyhans obtained copies of everything in that file including the sheet that read "69 Dodge wrecker." After the suit was filed but before Mitchell was made a party the Mooneyhans subpoenaed the file. Maclin, a Mitchell stockholder, began assembling the file and when he came across the scratch sheet he drew a line through the "69" and wrote "76." A copy of the

altered scratch sheet was referred to at pretrial as exhibit P-34 for identification while the copy of the unaltered scratch sheet was referred to as P-3.

¶21. Dixie argues here that the jury was allowed to consider exhibit P-34, the altered document, without it being admitted into evidence. What happened is as follows. During the testimony of Riley, the Mooneyhans sought to introduce into evidence exhibit P-3. The following dialogue took place:

Q. All right, and at that time in 1984, almost two years before this policy with Dixie was taken out, you made some calculations, didn't you, and I'm handing you exhibit P-3.

A. Yes, sir.

Q. All right, is that in your handwriting, exhibit P-3?

A. Yes.

BY MR. CHAPMAN (Mooneyhans' attorney): I would move its introduction.

BY MS. SAUNDERS (Dixie's attorney): We have a P-34.

BY MR. CHAPMAN: P-3.

BY THE COURT: P-3, I believe.

BY MS. SAUNDERS: Okay, as to that document, Dixie and Stonewall would like to approach the bench with the court reporter and make a record at this point.

BY THE COURT: All right, approach the bench.

At that time Dixie objected to the introduction of the scratch sheet either as originally written or as altered. The objection was based on the fact that it was Dixie's understanding prior to trial that the document would be offered against Mitchell. Since the Mooneyhans settled with Mitchell, Dixie objected to the document being "used against Dixie to impute some form of bad faith misconduct based upon the agent's post-denial conduct." The trial court overruled the objection.

¶22. Thereafter, P-3 was received into evidence. After P-3 was marked and placed into evidence, the following exchange took place between the court and counsel:

BY MR. CHAPMAN: With the permission of the Court, your Honor, I am going to offer the original and a copy of it and at the conclusion of the trial we will give the original of it back, if that is satisfactory.

BY MS. SAUNDERS: May I see it?

BY MR. CHAPMAN: Sure.

(Mr. Chapman approaches Ms. Saunders.)

BY MR. CHAPMAN: For the record, your Honor, I will attach by staple the original to the copy of it.

BY THE COURT: All right, sir.

What Mr. Chapman stapled to exhibit P-3 was the original of what had previously been identified as P-34, a copy of the altered scratch sheet where the "69" was marked through and "76" was added. By doing this, the jury got a copy of the unaltered document and stapled to it the altered original. It is unclear from the record whether Chapman showed Saunders both the unaltered copy and the altered original. Dixie argues in its brief that it was only shown the copy which had previously been referred to as P-3. The Mooneyhans on the other hand contend that Dixie was shown both documents. It is impossible for this Court to determine with certainty what was shown, but from Dixie's actions or rather inactions at trial it would seem that Dixie had no idea that the altered original was being stapled to P-3 and submitted to the jury.

¶23. Neither Riley nor Maclin, who made the change, was questioned about the alteration. Dixie argues that the Mooneyhans' counsel knowingly misrepresented the fact that he was stapling the altered document to a copy of the unaltered document. Mr. Chapman did question Riley concerning P-3:

> (By Mr. Chapman) Now I am handing you exhibit P-3 and I have got an enlargement of it also. And I am going to put exhibit P-3 up on this sheet here and first I would like to ask you if all of the handwriting on exhibit P-3, the original which you have in you hand, is in your handwriting? Is that correct?
>
> A. Yes.
>
> ....
>
> Q. All right, and the phrase at the top of this document, "69 Dodge wrecker," that's in your handwriting?
>
> A. That's right.

¶24. Riley's answers seem to indicate that she is testifying about the copy of the unaltered original since she indicated that all the handwriting on it was hers. Although counsel mentions that she is holding the original it is possible that Dixie's counsel thought he was using "original" to distinguish between the copy and the enlargement, which was an enlargement of the unaltered version of the scratch sheet. Dixie's counsel also may have believed that the Mooneyhans' attorney was referring to P-3 as the copy of the scratch sheet in its "original" unaltered form as opposed to the altered document itself.

¶25. During closing arguments, once again P-3 was brought into play. Dixie's counsel made the following comment to the jury:

> You've seen a lot of paper chasing here today. I beg you to go through every exhibit you're handed and find one written reference to a '76 Dodge wrecker, proof that Annie Riley knew what that vehicle was. I challenge you to find one document.

During their rebuttal argument, the Mooneyhans' attorney pointed the jury toward the altered scratch sheet:

> A moment ago we were challenged to go through and find any document in this file that says anything about a 1976 Dodge wrecker. This is exhibit P-3. I've waited for this moment to show it to the jurors. It hasn't been commented on. You'll notice -- this is the original -- and what is on the original of this

document? I'll ask a question. What's on the original of the document, right here, in evidence? It's a copy of this. It needs no comment. It came from the Mitchell file. It hasn't been commented on to this point.

BY MR. CHAPMAN: So I'll accept that challenge, ladies and gentlemen. I'll find a document. And it's right there, sitting among us this entire time.

¶26. Attorney Saunders' comments to the jury that there was no written reference to a "76 wrecker" in evidence would seem to indicate that she did not realize the altered document had been attached to exhibit P-3. Attorney Chapman's statements make it clear that the enlargement of P-3 shown to the jury earlier was an enlargement of the unaltered document. It is also clear that he intentionally waited until Dixie could not respond before pointing out the altered document to the jury. He did not explain how the document became altered or whether or not it was the original or the copy that had been tampered with. In fact he specifically points out that the document with the "76" is the original scratch sheet. The entire time he is pointing out the document to the jury he refers to it as exhibit P-3 and never specifically mentions the "76" written on it, telling the jury that it is the original and so needs no comment.

¶27. Dixie argues that the altered original was not properly introduced at trial and therefore it was error for it to be submitted to the jury during its deliberations. Dixie contends that the Mooneyhans' attorneys misrepresented the fact that they were attaching the altered original to exhibit P-3 and the only way defense counsel could have known what opposing counsel was doing and thereby object was to suspect duplicity on their part. Dixie also contends that during its rebuttal closing argument opposing counsel intentionally misled the jury into believing the altered document had been in Mitchell's files the entire time and that it was proof that it knew the 1976 Dodge was a wrecker.

¶28. The Mooneyhans make several arguments to support their contention that the altered original was properly submitted to the jury. They adamantly contend that although the original document had been altered it was still the original of P-3 as well as the original P-34 for identification. And, they argue, since it was the original of P-3 they were just complying with the Best Evidence Rule. The Mooneyhans also maintain that any reference made to the altered exhibit during closing argument was in response to Dixie's closing argument and therefore invited error. Lastly, the Mooneyhans claim Dixie has waived any objection to their actions surrounding P-3 because they failed to object at trial.

¶29. As noted above, this issue turns on whether or not Dixie's counsel knew the altered original was being attached to P-3. The record is not clear on this. The Mooneyhans' attorney did show Dixie exhibit P-3, but the record does not reveal if the altered original was also shown. Dixie's failure to elicit testimony as to when and how the alteration came about and their failure to object to opposing counsel's comments during closing argument would seem to indicate that they did not know the altered sheet had been attached.

¶30. The scratch sheet was perhaps the single most important piece of evidence at trial. It was the only written evidence that Mitchell and therefore Dixie ever knew the Mooneyhans' 1969 truck was a wrecker. Allowing the jury to see, without explanation, the scratch sheet on which the "69" had been marked through and "76" inserted raises a strong suspicion of prejudice, especially when coupled with plaintiff counsel's remarks during closing argument. The jury's confusion over the exhibit is evident. During its deliberations, the jury sent a note to the trial judge asking how the "76" got on the original scratch sheet and why it was different from the copy.

¶31. In a departure from Mississippi law prior to the adoption of the Rules of Evidence, the Best Evidence Rule no longer requires without exception, that when available, the original be submitted along with or instead of a duplicate copy. This is especially true when the original was altered after the copy was made.

¶32. M.R.E. 1002 requires that in order to prove the content of a writing, the original writing is required, except as otherwise provided by law. One such exception is M.R.E. 1003 which states:

> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

A duplicate is defined by M.R.E. 1001(4) as:

> a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction or by other equivalent techniques which accurately reproduce the original.

¶33. Under this definition a photocopy would be a duplicate. Since Dixie raised no objection to the authenticity of the copy or to the fact that the note had been written by a Mitchell employee, the copy was admissible to the same extent as an original. It would not have been unfair to admit only the duplicate. In fact the duplicate may have been the better evidence in this instance since the alteration to the original occurred after the copy was made. **See Weinstein's Evidence,** Weinstein and Berger Vol. 5 ¶1003[02] (1994).

¶34. Once the scratch sheet was altered it was in fact destroyed to the extent that it was no longer admissible as the original of the copy before the alteration. Because the original was destroyed by a party other than the proponent, the copy, even if not considered as a duplicate original, would be admissible under M.R.E. 1004(1).

¶35. The Mooneyhans' argument that Dixie waived this issue by failing to object at trial does not apply if Dixie did not know the altered document was attached to P-3. "Ignorance of a material fact negatives waiver, and waiver cannot be established by a consent given under a mistake or a misapprehension of fact. Waiver presupposes a full knowledge of an existing right or privilege and something done designedly or knowingly to relinquish it." 28 Am.Jur.2d, **Estoppel and Waiver**, §158. **See *Ewing v. Adams,*** 573 So.2d 1364, 1369 (Miss. 1990). If Dixie did not know the altered scratch sheet was being submitted to the jury without explanation they could not object. It would be impossible to know an objection is warranted when the objectionable action is not made known to the adversely affected party.

¶36. The Mooneyhans go on to state that any comments made about the altered document during closing argument were invited by Dixie's remarks that there was no written reference to a 1976 Dodge wrecker in evidence and therefore not reversible error. ***Booker v. State,*** 511 So.2d 1329, 1331 (Miss. 1987). Dixie could not have invited these comments if it had no reason to know the altered document was attached to P-3. If Dixie did have reason to know the altered scratch sheet was in evidence, counsel's comments still did not leave the door open for the Mooneyhans' attorney to intentionally mislead the jury about the document.

> A statement by counsel in argument of facts not in evidence or a misstatement of the evidence is generally regarded as reversible error, especially if the statement of facts not in evidence is willful.

> Counsel commits prejudicial misconduct by insinuating as facts matters he knew are not fact or could not be put into evidence.

75A Am Jur 2d, **Trial**, §611.

¶37. The statements made by the Mooneyhans' attorney implied that the document with the "76" on it had been in the Mitchell file all along and was proof they knew the 1976 truck was a wrecker. He stated that he had waited until that moment to point it out to the jury and that it spoke for itself and needed no explanation. Counsel waited until a time when Dixie could not make that explanation itself, an explanation which would have shown that the "76" had been added after litigation began and had absolutely no bearing on Mitchell's or Dixie's knowledge that the truck was a wrecker.

> Although adversarial in nature, trial proceedings should not be viewed as a no-holds barred wrestling match. The attitude that everything is proper as long as you don't get caught is not one that our profession or this society can long survive. A lawyer who knowingly offers inadmissible and prejudicial evidence is not performing in a professionally competent manner . . . .

*McCollum v. Franklin,* 608 So.2d 692, 695 (Miss. 1992).

¶38. The introduction of the altered scratch sheet without an explanation as to how and when it was altered coupled with the comments and insinuations by the Mooneyhans' attorney clearly prejudiced Dixie. The jury even wrote a note asking why the two documents submitted as P-3 were different. The only written evidence that Mitchell, and therefore Dixie, knew either of the two trucks were commercial wreckers was the unaltered scratch sheet. This was a crucial piece of evidence. Since it was the original scratch sheet and not the copy that contained the "76," the jury could have easily believed the copy had been altered to remove the "76." To have allowed the jury to receive the altered document without explanation, either by design or mistake, surely prejudiced the jury. However, we find the other evidence presented in this case fully supports the jury's finding of actual damages and in fact would have supported a finding by the trial judge that there was no jury question on this issue. Therefore, we affirm the jury's verdict of actual damages. **See Issue II,** *infra.* It is the effect of this prejudice with regards to the award of punitive damages that gives us concern. **See Issue IV,** *infra*.

## II. DIXIE CANNOT BE LIABLE FOR PUNITIVE DAMAGES UNDER EXISTING LAW.

### A. DIXIE HAD AN ARGUABLE REASON TO DENY THE CLAIM

### B. THE "LYING EXCEPTION" DOES NOT APPLY IN THIS CASE

### C. PUNITIVE DAMAGES ARE NOT JUSTIFIED IN A CASE OF FIRST IMPRESSION

### D. THERE WAS NO EVIDENCE OF MALICE, GROSS NEGLIGENCE OR RECKLESS DISREGARD OF THE MOONEYHANS' RIGHTS

¶39. Dixie argues that it cannot be liable for punitive damages because it had an arguable reason to deny the Mooneyhans' claim. "[B]efore punitive damages may be recovered from an insurer, the insured must prove by a preponderance of evidence that the insurer acted with (1) malice, or (2) gross negligence or reckless disregard for the rights of others." *Universal Life Insurance Co. v. Veasley,* 610 So.2d 290, 293 (Miss. 1992), *citing* *Weems v. American Security Ins. Co.,* 486 So.2d 1222, 1226-27 (Miss. 1986); *Aetna*

*Casualty & Surety Co. v. Day,* 487 So.2d 830, 832 (Miss. 1986).

¶40. It is the trial court's responsibility to review all evidence before it for the purpose of determining whether the issue of punitive damages should be put before the jury. Where there is a legitimate or arguable reason for the insurer to deny the claim, the jury should not be permitted to decide the issues of punitive damages. *Lewis v. Equity Nat'l. Life Ins. Co.,* 637 So.2d 183, 185 (Miss. 1994); *Universal,* 610 So.2d at 293. *Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172, 1186-1184 (Miss. 1990); *Pioneer Life Ins. Co. of Illinois v. Moss,* 513 so.2d 927, 929 (Miss. 1987). In *State Farm Fire and Cas. Co. v. Simpson,* 477 So.2d 242, 250 (Miss. 1985), this Court defined the term "legitimate or arguable reason" as "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort." *See Lewis,* 637 So.2d at 185; *Universal,* 610 So.2d at 293; *Pioneer Life,* 513 So.2d at 930.

¶41. Where the trial judge determines there was no arguable reason to deny the claim and the insurer may be deemed to have acted unfairly and in bad faith, the issue of punitive damages should be submitted to the jury regardless of whether or not a directed verdict was granted to the insured. *Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172, 1185 (Miss. 1990).

¶42. Dixie maintains it had an arguable reason to deny the Mooneyhans' claim based on the fact that it was not authorized to insure commercial vehicles in Mississippi and its belief they could not be bound to cover a vehicle it was not licensed to cover. They also argue the possibility that the Mooneyhans materially misrepresented the fact that the '76 Dodge was a wrecker was an arguable reason to deny the claim

¶43. Dixie goes on to argue that the "lying exception" does not apply in this instance since its agent did not intentionally misrepresent to Dixie a fact disclosed by the Mooneyhans. *Blue Cross & Blue Shield of Miss. v. Campbell,* 466 So.2d 833 (Miss. 1984). Rather, the agent simply made a mistake in not remembering Mooneyhan had told her the '69 truck was a wrecker.

¶44. Dixie suggests this is a case of first impression and consequently, punitive damages are not allowed. As authority it cites *Gulf Guaranty Life Ins. Co. v. Kelley,* 389 So.2d 920, 921 (Miss. 1981) and *Dunn v. State Farm Fire & Cas. Co.,* 927 F.2d 869, 874 (5th Cir. 1991).

¶45. Although the precise issue of whether an agent can bind an insurer to coverage the insurer is not authorized to give has not previously been addressed it is well settled that an insurer is liable for actions of its agents within the scope of the agent's actual or apparent authority. **See** *Eaton v. Porter,* 645 So.2d 1323, 1325 (Miss. 1994); *Ford v. Lamar Life Ins. Co.,* 513 So.2d 880, 888 (Miss. 1987). Mitchell was working within its apparent authority when it placed the Mooneyhans' coverage with Dixie. **See Issue V, infra.** Also, in its Reply Brief Dixie contradicts itself on this issue. There Dixie says, "If this accident claim involved the 1969 wrecker, then Dixie would not have had an arguable reason to deny the claim once the scratch sheet was discovered during depositions." Here Dixie relies entirely on the defense that the Mooneyhans misrepresented the fact that the '76 Dodge was a wrecker.

¶46. The trial court denied Dixie's motion for a directed verdict. The Mooneyhans' counsel stated that while they believed they were entitled to a directed verdict on the issue of whether there was an arguable reason to deny the claim they were willing to let the issue of material misrepresentation go to the jury.

¶47. Whether or not Dixie had an arguable reason to deny the claim after the scratch sheet was discovered

turns on whether or not their agent's knowledge that the '69 Dodge was a wrecker equals knowledge that the '76 Dodge was probably a wrecker as well. The scratch sheet is convincing evidence that Mooneyhan did tell the agent that the '69 truck was a commercial wrecker. The evidence is also uncontradicted that the agent, Riley, almost immediately forgot this very important fact and wrote the application for a personal-use-only pickup. Two years later the insurance on the '69 Dodge was transferred to Dixie. There is no evidence that the Mooneyhans again told Riley the truck was a wrecker. A month later Mooneyhan told Riley he wanted the '69 Dodge removed from the policy and a '76 Dodge added. Riley stated that she was never told the '76 Dodge was a wrecker. After the accident that gave rise to this case Mooneyhan never tried to conceal the fact that the '76 was a wrecker and in fact drove it to Mitchell's offices when he went to file the claim.

¶48. Although an argument can be made that there was a jury question here, it seems logical that when Mooneyhan informed Riley that he wanted to replace the coverage on the '69 Dodge with '76 Dodge then he intended the coverage to be the same. That is, coverage for a wrecker used for business as well as personal purposes. The fact that the coverage for both was personal coverage does not matter; Mooneyhan intended to get and thought he had coverage for the truck as a wrecker. In *Mississippi Farm Bureau Mut. Ins. Co. v. Todd,* 492 So.2d 919, 930 (Miss. 1986) this Court stated that essential terms of an insurance binder may be supplied by implication if readily inferable from the prior course of dealing between the parties. **See** *Smith Trucking Co., Inc. v. Cottonbelt Ins. Co.,* 556 F.2d 1297 (5th Cir. 1977).

¶49. Alternatively, Dixie contends that even if it did not have an arguable basis upon which to deny the claim the Mooneyhans failed to prove Dixie acted with malice, gross negligence or reckless disregard of the insured's rights. Dixie maintains that the whole dispute arose out of a mistake by Riley. This Court has held that mere negligence or mistake is not sufficient to justify an award of punitive damages. *Bellefonte Ins. Co. v. Griffin,* 358 So.2d 387 (Miss. 1987)(negligent failure to properly investigate claim did not warrant punitive damages award); *Pioneer Life Ins. Co. Of Illinois v. Moss,* 513 So.2d 927, 930 (Miss. 1987) (This Court held, "[o]rdinary torts, the product of forgetfulness, oversight, or the like, do not rise to the heightened level of an independent tort which warrant imposition of punitive damages liability."

¶50. The negligence-honest mistake defense was a valid one up until Dixie became aware that the Mooneyhans did in fact disclose to their agent that the '69 truck was a wrecker. Once that fact became known Dixie should have offered to pay the claim. Dixie cannot avail itself of the mistake defense if after it became aware of the mistake it continued to deny the claim.

¶51. There is some evidence to support the jury's finding that Dixie acted with "malice, gross negligence or reckless disregard of the insured's rights." Although there was evidence of a continuing investigation, it took four months from the time the claim was filed until Dixie denied coverage. There was an interoffice memo from a Dixie employee asking why Dixie's attorney had been asked if the claim could legally be denied. There was a letter from the Mooneyhans' attorney asking when a substitute letter could be expected. Dixie continued to deny the claim after the scratch sheet became known. Although these actions could support a punitive damages award, the jury was undoubtedly prejudiced by the altered scratch sheet which they received without explanation.

## III. THIS PUNITIVE DAMAGES AWARD VIOLATES DIXIE'S RIGHT TO DUE PROCESS

### A. NO ADEQUATE POST-TRIAL REVIEW.

**B. APPELLATE REVIEW IN ACCORDANCE WITH HASLIP REQUIRES REVERSAL OF THIS AWARD.**

**C. APPLYING EXISTING MISSISSIPPI LAW, THIS AWARD IS A DENIAL OF DUE PROCESS.**

**1. MISSISSIPPI LAW LACKS FOREKNOWN STANDARDS THAT WOULD PUT A DEFENDANT ON NOTICE OF A POTENTIAL PUNITIVE AWARD**

**2. VAGUE JURY INSTRUCTIONS ARE ALREADY IMPERMISSIBLE UNDER MISSISSIPPI LAW.**

**3. RANDOM AND ARBITRARY AWARDS REVEAL THE INCONSISTENT ENFORCEMENT OF PUNITIVE DAMAGES IN THIS STATE.**

¶52. Here, Dixie attacks the constitutionality of Mississippi's punitive damages scheme. The National Association of Independent Insurers ("NAII") as *Amicus Curiae* filed a brief urging this Court to use the case *sub judice* "as a vehicle to articulate standards and procedures for juries and the courts in Mississippi to utilize in awarding and evaluating punitive damages." To support their arguments, both Dixie and NAII rely extensively on the U.S. Supreme Court's decision in *Pacific Mut. Life Ins. Co. v. Haslip,* U.S._, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), wherein the Court expressed concern over the constitutionality of Mississippi's system of awarding and reviewing punitive damages. NAII also significantly relies on *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th. Cir. 1991) to support its argument.

¶53. There is no need to outline all the arguments presented by Dixie and NAII because this Court in *Ivy v. General Motors Acceptance Corp.,* 612 So.2d 1108 (Miss. 1992), decided after both *Haslip* and *Eichenseer*, held that Mississippi's punitive damages scheme passes constitutional muster under *Haslip*. Our decision in *Ivy* is directly on point here. This issue is therefore without merit.[1]

¶54. For some reason in subpart C-2 of this issue Dixie complains that the instructions dealing with punitive damages presented to the jury in the case *sub judice* were vague in defining what acts would justify an award of punitive damages. Dixie made no such objection at trial; therefore, the issue is not properly preserved for appeal. *Arledge v. McFatter,* 605 So.2d 781, 787 (Miss. 1992); *Young v. Robinson,* 538 So.2d 781, 783 (Miss. 1989). *Shell Oil Co. v. Murrah,* 493 So.2d 1274, 1276 (Miss. 1986).

**IV. DIXIE IS ENTITLED TO A NEW TRIAL OR SUBSTANTIAL REMITTITUR.**

**A. THE AMOUNT OF THE PUNITIVE AWARD COMPARED TO THE ACTUAL DAMAGES SHOCKS THE CONSCIENCE.**

**B. OTHER EVIDENCE REVEALS THE JURY'S PREJUDICE AND CONFUSION.**

¶55. Dixie alternatively argues that the punitive award was so excessive as to merit a new trial on damages or substantial remittitur.

No hard and fast rule exists for establishing the maximum amount of punitive damages awardable in any given case. *Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172 (Miss. 1990); *Bankers Life and Cas. Co. v. Crenshaw,* 483 So.2d 254 (Miss. 1985). Instead, the amount must be considered in light of several factors. First, the amount awarded should serve to punish the insurer and to deter it from committing similar offenses in the future. Second, the amount should serve as an example set to deter others from committing similar offenses. Third, the amount awarded should account for the insurer's pecuniary ability and financial worth. And fourth, the amount constitutes compensation for the plaintiff for his or her "public service" in bringing the action. *Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172.

On appeal, an award will be disturbed only where it is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience of the court. *Williams,* 566 So.2d at 1190; *Crenshaw,* 483 So.2d at 278.

*Valley Forge Ins. Co./CNA Ins. Co. v. Strickland,* 620 So.2d 535, 540-41 (Miss. 1993).

¶56. Dixie maintains "when the $542 in actual damages is compared with the $1,000,000 punitive verdict, the contrast is abundant evidence of bias, passion or prejudice on the jury's part." Dixie also argues the trial court did not use the appropriate standard to review the punitive award and deny the motion for remittitur.

¶57. Dixie contends that the fact the jury saw the altered scratch without an explanation as to when and how it was altered combined with the evidence of their confusion by asking for an explanation is evidence that the jury was prejudiced. Dixie goes on to complain that the jury was prejudiced by several remarks made by the trial judge. Only one of the comments complained of by Dixie was made in front of the jury and Dixie made no objection to this statement at the time it was made. "[I]n order to obtain a review of the question of propriety of remarks or conduct of the trial judge during a trial, the remarks must be especially called to the attention of the trial judge when made, and a correction requested or a proper objection made at the time." *Wirtz v. Switzer,* 586 So.2d 775, 782 (Miss. 1991), *quoting Tippit v. Hunter,* 205 So.2d 267, 271 (Miss. 1967).

¶58. In *Bankers Life and Cas. Co. v. Crenshaw,* 483 So.2d 254, 278 (Miss. 1985), this Court said the "shock must be experienced by the judicial conscience, not the actual conscience of the members of this Court....We are not authorized to disturb a jury verdict regarding amount of damages because it 'seems too high' or 'seems too low'."

¶59. In *Williams,* 566 So.2d at 1191, this Court held that a $200,000.00 punitive award for bad faith refusal to pay a life insurance claim was not excessive even though it amounted to 5¼% of the insurance companies' net worth because the record showed: "(1) *egregious breach* by both Andrew Jackson and its agents of the implied covenant of good faith and fair dealing; (2) attempted use of Willie's financial dire straits, lack of sophistication, and inferior bargaining position as a settlement leverage; (3) acts of fraud; and (4) general cavalier treatment of Willie." 566 So.2d at 1190.

¶60. In *Valley Forge,* we upheld a $1,000,000.00 punitive award which amounted to 1.5% of the company's net worth stating that "[g]iven the egregiousness of Valley Forge's conduct in holding up Tina's recovery for her injuries, as well as the serious actual damages suffered, it cannot be said that this award was so excessive as to evidence passion, bias, or prejudice on the part of the chancellor." 620 So.2d at 541.

¶61. In *Independent Life & Accident Ins. Co. v. Peavy,* 528 So.2d 1112 (Miss. 1988), this Court upheld a $250,000.00 punitive award where the actual damages amounted to only $412.20 because of the insurer's wrongful denial of waiver of life insurance premium benefits. The award was less than two tenths of one percent of Independent Life's net worth and the court stated the award was not excessive "in light of the such factors as 1) the amount necessary to punish and deter the wrongdoer, 2) the amount necessary to deter others, and 3) Independent Life's financial worth."

¶62. In *Mutual Life Ins. v. Estate of Wesson,* 517 So.2d 521 (Miss. 1987), a case heavily relied upon by Dixie, the net assets of the insurer were $8 billion; however, this court reduced an $8,000,000.00 punitive award to $1,500,000.00. The Court stated there were no terrible personal injuries sustained by the victims, rather that this was a bad faith claim with no personal injuries or actual damages other than the policy limits of $87,000.00. The punitive damages award was ninety-two (92) times the amount of actual damages. The Court held, after examining other bad faith claims cases and applying the appropriate standards, that the award was excessive and a remittitur was warranted.

¶63. In the case *sub judice* there were no personal injuries whatsoever. At least up until the scratch sheet with "69 Dodge wrecker" was found during the discovery process, Dixie had an arguable reason to deny the claim. The only detriment that the Mooneyhans suffered was that Mooneyhan, a mechanic, had to repair the truck himself. Although Dixie filed a counter claim against the Mooneyhans there was never any attempt to use the Mooneyhans lesser bargaining power to try and settle the case. Mooneyhan testified that after turning the case over to his attorneys he let them handle it. The $1,000,000.00 punitive damages award was 1.675% of Dixie's net assets in 1990 and 1,875 times actual damages. The punitive damages awarded in this case were excessive and we refuse to enforce the award.

¶64. Instead of imposing a remittitur in this case we remand for a new trial on the issue of punitive damages only. We do this because of the possibility of substantial prejudice to the jury as a result of their receiving the altered scratch sheet attached to exhibit P-3.

## V. WITHOUT ACTUAL OR APPARENT AUTHORITY, THE AGENCY COULD NOT BIND DIXIE TO COVERAGE OF A COMMERCIAL WRECKER.

### A. THE MITCHELL AGENCY HAD NO APPARENT OR ACTUAL AUTHORITY TO BIND COMMERCIAL COVERAGE.

¶65. Next, Dixie argues that Mitchell had no actual or apparent authority to bind them to coverage for a commercial vehicle because Dixie was not authorized to sell commercial insurance in the State of Mississippi, and therefore the policy should have been void *ab initio*.

> [A] principal is bound by the actions of its agent within the scope of that agent's real or apparent authority. One seeking to recover based on the theory of apparent authority must show 1) acts or conduct on the part of the principal indicating the agent's authority, 2) reliance on those acts, and 3) a detrimental change in position. *Gulf Guaranty Life v. Middleton,* 361 So.2d 1377, 1383 (Miss. 1978); *Steen v. Andrews,* 223 Miss. 694, 697-98, 78 So.2d 881-883 (1955). Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have. *Id.*

*Ford v. Lamar Life Ins. Co.,* 513 So.2d 880, 888 (Miss. 1987) (citations omitted). **See also,** *Andrew Jackson Life,* 566 So.2d at 1180-81.

¶66. "Whether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder." *Andrew Jackson Life,* 566 So.2d at 1181. **See also,** *Eaton v. Porter,* 645 So.2d 1323, 1325 (Miss. 1994). Dixie withdrew its jury instruction dealing with apparent authority. No other such instruction was asked for or submitted, so Dixie has no right to now complain. This issue was never presented to the trial court for review and may not be raised for the first time on appeal. *Century 21 Deep South Prop. v. Corson,* 612 So.2d 359, 371 (Miss. 1992). In fact, Dixie affirmatively accepted instruction P-16(a), as modified, which reads in part: "Dixie Insurance Company is responsible for the acts of its agent, The Mitchell Company, Inc., even though such acts be contrary to the principal's express instructions."

¶67. Nevertheless, the evidence suggests that under the three-pronged test set out above, Mitchell had the apparent authority to bind Dixie to the coverage of the Mooneyhans' wrecker. It is not disputed that Mitchell was an agent of Dixie with the actual authority to place personal line policies written by Dixie with the general public. According to the scratch sheet found in Mitchell's files, in 1984 Mooneyhan told the agent that he wanted to insure a 1969 Dodge wrecker. The Mooneyhans relied on Mitchell to choose which insurance company with which to place the policy. Thereafter, the truck was insured with the Moore Group. Some two years later the Mitchell agent submitted an application for insurance for the same truck to Dixie. The fact that Dixie sent Mooneyhan a policy was an act indicating the agent's authority.

¶68. The Mooneyhans needed commercial insurance in order to be placed on the state rotation system for wreckers. He relied on the poli cy issued by Dixie as proof of such coverage. Assuming the truck was covered by Dixie, the Mooneyhans did not attempt to gain insurance from any other source. After the accident, Dixie denied the claim and Mooneyhan had to fix the damage to the truck himself, suffering financial loss. Although the evidence to support each prong of this test is not as strong as in some cases dealt with by this Court, they were met.

### B. THE TRIAL COURT RULED AGAINST DIXIE ONLY TO PRESERVE A REMEDY WHERE A REMEDY EXISTED ALREADY.

¶69. Dixie contends that the trial court's reasoning in denying it the opportunity to present its "void *ab initio*" defense was that if Dixie did prove the policy was void *ab initio* then the Mooneyhans would be left without a remedy and Dixie would be allowed to "profit by its own wrong." Dixie then goes on to try to prove that this reasoning is incorrect. They cite Miss. Code Ann. § 83-17-3 and *Wilkinson v. Goza,* 165 Miss. 38, 145 So. 91 (Miss. 1932), which provides that where an insurance agent writes coverage for a company not authorized to do business in the state then the agent will be personally liable on the contract.

¶70. First, this statute does not apply here since Dixie was authorized to do business in the State of Mississippi. The statute says nothing about writing coverage an insurance company is not authorized to provide.

¶71. Secondly, there is no indication that the trial court denied Dixie the opportunity to argue the "void *ab initio*" defense for the reasons stated by Dixie. The trial court refused to allow Dixie to present evidence of this defense because even though Dixie was not authorized to write insurance on commercial vehicles they were bound by the acts of their agents working within the scope of their apparent authority.

## VI. THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTIONS P-27, P-29(A) AND P-30 WHICH WERE PEREMPTORY AND CONFUSING.

### A. INSTRUCTION P-27 IS PEREMPTORY AND MISSTATES THE FACTS.

¶72. Dixie objects to the trial court's granting of instruction P-27 arguing that it takes away from the jury the issue of whether or not the '76 Dodge wrecker was covered under the policy. Dixie goes on to argue that although instruction D-12 required the jury to decide the coverage issue based on whether the Mooneyhans made a material misrepresentation, P-27 takes away the "essential features of both the materiality and the misrepresentation by stating that the lack of authorization and the fact that the truck was a wrecker are not defenses." Dixie maintains that the instructions are contradictory and amounted to a situation where two instructions "are in hopeless and substantive conflict" requiring reversal. *Payne v. Rain Forest Nurseries, Inc.,* 540 So.2d 35, 41 (Miss. 1989); *Strickland v. Rossini,* 589 So.2d 1268, 1273 (Miss. 1991).

¶73. The Mooneyhans argue that there was no question of fact as to whether the '76 truck was covered because even though Dixie was not authorized in the State of Mississippi to write policies for commercial vehicles it was still bound by the apparent authority of its agent. The Mooneyhans contend that the issue was whether Dixie had an arguable reason to deny the coverage, namely whether the Mooneyhans made a material misrepresentation as to the truck's type and use. They also state any defect in P-27 does not require reversal because when all instructions are read together they adequately instruct the jury. *Detroit Marine Engineering v. McRee,* 510 So.2d 462 (Miss. 1987).

¶74. The trial court held as a matter of law that the fact that the '76 Dodge was a wrecker and Dixie was not authorized to write policies for commercial vehicles did not effect coverage and was not a defense unless it was proven that the Mooneyhans materially misrepresented the fact that the truck was a wrecker. Although P-27 may be somewhat confusing, the other instructions, especially D-12, adequately informed the jury that if the Mooneyhans made a material misrepresentation that would have affected Dixie's issuance of the policy then Dixie had an arguable reason to deny the claim and would not be liable to the Mooneyhans. **See** *James W. Sessums Timber Co. v. McDaniel*, 635 So.2d 875, 879 (Miss. 1994). P-27 and D-12 did not significantly contradict each other and reversal is not required because both were given.

### B. INSTRUCTION P-29(A) ALSO MISSTATES THE FACTS.

¶75. Dixie argues that instruction P-209(a) infers that Dixie wrongfully canceled the Mooneyhans' policy when cancellation was not at issue. When P-29(a) was first submitted, Dixie objected on these grounds. However, the trial court offered to amend the instruction and resubmit it. When the instruction was resubmitted after modification, Dixie stated it had no objection to it being offered. Thus, Dixie waived its right to challenge the instruction on appeal. *Arledge v. McFatter,* 605 So.2d 781, 787 (Miss. 1992); *Young v. Robinson,* 538 So.2d 781, 783 (Miss. 1989). *Shell Oil Co. v. Murrah,* 493 So.2d 1274, 1276 (Miss. 1986).

### C. INSTRUCTION P-30 FAILS TO SPECIFY WHAT ACTS AMOUNTED TO GROSS NEGLIGENCE OR INTENTIONAL DISREGARD OF THE MOONEYHANS' RIGHTS.

¶76. Dixie contends that P-30 is silent as to what acts on the part of Dixie might amount to "a grossly negligent manner tantamount to intentional disregard for the rights of the Mooneyhans" and that no other

jury instruction cures this error. They cite ***Coca-Cola Bottling Co. v. Reeves,*** 486 So.2d 374, 387-388 (Miss. 1986) , to support their proposition that Mississippi law requires jury instructions to specify those facts upon which they may find liability. In that case this Court stated that the instruction was erroneously given over the appellant's objection.

¶77. Although Dixie did object to P-30 it was on grounds that the first paragraph was misleading and the second and third paragraphs were out of context, lumping the "'69 and '76" trucks together as if they were one. Dixie did not object on the grounds that specific facts alleged to amount to "gross negligence" were not included in the instruction.

¶78. "[W]here a party fails to make a proper, specific objection to allow the lower court to consider an issue, this court will not normally entertain the assignment of error." ***Dedeaux v. J.I. Case Co., Inc.,*** 611 So.2d 880 (Miss. 1992). **See also,** ***T.K. Stanley, Inc. v. Cason,*** 614 So.2d 942, 954 (Miss. 1992). This issue was not properly preserved for appeal.

## CONCLUSION

¶79. The introduction of the altered scratch sheet without an explanation coupled with the excessiveness of the punitive award evinces bias, passion and prejudice on behalf of the jury. All other issues presented are without merit. For the foregoing reasons this case is affirmed as to actual damages and reversed and remanded for a new trial on the issue of punitive damages only.

**¶80. AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER, P.J., PITTMAN, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J.**


**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**


¶81. I agree with the majority's findings that the Mooneyhans are entitled to actual damages. In finding that the amount of the punitive damage award is excessive, however, the majority has substituted its judgment for that of the jury. Accordingly, I disagree with the decision to reverse and remand for a new trial on the issue of punitive damages.

¶82. Dixie's denial of the Mooneyhan's uninsured motorist claim on the basis that the company did not write coverage in Mississippi for commercial vehicles amounts to post-claim underwriting, wherein an insurer, rather than refusing to write a policy, will wait until after a claim is filed to deny coverage on grounds that the policy should not have been written in the first place. In this case, the insurer had ample opportunity to review the acts of its agent and the insured's application before issuing the policy and providing coverage. Moreover, the Mooneyhans had had coverage with Dixie on a wrecker bed-equipped pick-up truck used in their business for two years before this claim was filed, giving the insurer time to determine it did not care to insure the vehicle even before a claim was even filed. Nevertheless, it waited until months *after* the claim was filed to conclude that the insured vehicle was not covered under the terms of the policy. Clearly, this is

not a fair claim practice; rather, it is a practice which this and other insurers should be discouraged from following.

¶83. Our uninsured motorist statute makes no distinction between commercial and personal vehicles. That notwithstanding, it is clear from the evidence in this case that the Mooneyhans had advised their insurance agent, Annie Riley, that the coverage they sought was for a wrecker-equipped pick-up truck used for commercial purposes. Riley's scratchpad notes reference the "69 Dodge wrecker" initially covered under the disputed policy. Not even when the policy was revised to reflect the deletion of the 1969 Dodge and substitution of a 1976 Dodge were the Mooneyhans advised by Riley that their vehicles might not be covered by the premiums they had paid. Further, the record indicates that it was Riley, and not the Mooneyhans, who filled out the insurance applications *after* the Mooneyhans signed them. Any dispute, therefore, was properly between Dixie and its agent, Riley, and not between the insurer and its insured. *See Mississippi Farm Bureau Mutual Insurance Co. v. Todd,* 492 So. 2d 919 (Miss. 1986).

¶84. We have held that "'[a] plaintiff is entitled to punitive damages only if he has demonstrated a willful or malicious wrong or the gross, reckless disregard for the rights of others.'" *Valley Forge Insurance Co. v. Strickland*, 620 So. 2d 535, 540 (Miss. 1993), *cert. denied,* 114 S.Ct. 635, 126 L. Ed. 2d 593 (1993), quoting *Strickland v. Rossini*, 589 So. 2d 1268, 1273 (Miss. 1991). Punitive damages are to be assessed only in "extreme cases," and since they are intended "as an example and warning to others, 'they should be allowed only with caution and within narrow limits.'" *Beta Beta Chapter of Beta Theta Phi Fraternity v. May*, 611 So. 2d 889, 894 (Miss. 1992), quoting *Consolidated American Life Insurance Co. v. Toche*, 410 So. 2d 1303, 1304-05 (Miss. 1982); *Snow Lake Shores Property Owners Corp. v. Smith*, 610 So. 2d 357, 362 (Miss. 1992). The majority admits that since the claim was refused four months after it was filed, there is "some" evidence to support the jury's finding that the insurer had acted with "'malice, gross negligence or reckless disregard of the insured's rights.'" Slip op. at 22. These actions by a substandard insurer -- employing substandard claims handling and showing indifference to its insured -- warrant the imposition of punitive damages.

¶85. In finding that the amount of punitive damages awarded was excessive, the majority notes that the $1 million award represented 1.67 percent of Dixie's 1990 net assets and was 1,875 times the actual damage award of $542.00. While the net worth of the defendant is a factor to consider, the amount of a punitive damage award is not predicated upon the amount of actual damages awarded. It is, instead, conduct that is being punished. Therefore, we have held that "no hard and fast rule exists" for measuring the maximum award than may be made in any particular case. *Sessums v. Northtown Limousines, Inc.,* 664 So. 2d 164, 169 (Miss. 1995), *Strickland*, 620 So. 2d at 540; *Andrew Jackson Life Insurance Co. v. Williams,* 566 So. 2d 1172 (Miss. 1990). Indeed, we consider a variety of factors when determining whether an award of punitive damages is appropriate in insurance cases.

> First, the amount awarded should serve to punish the insurer and to deter it from committing similar offenses in the future. Second, the amount should serve as an example set to deter others from committing similar offenses. Third the amount awarded should account for the insurer's pecuniary ability and financial worth. And fourth, the amount constitutes compensation for the plaintiff in his or her "public service" in bringing the action.

*Strickland,* 620 So. 2d at 541.

¶86. The fact that the claim at issue was only for $542.00 makes Dixie's actions no less egregious than if the

Mooneyhan's claim had been for $5,420.00 or $54,200.00. It is Dixie's unfair claims practices that we seek to punish -- and to deter other insurers from following in its footsteps. Therefore, based on *Strickland,* the amount of a punitive damages award should reflect a figure that will serve to punish the wrongdoer and deter others rather than a figure which merely represents the dollar amount of damages suffered by the injured party. *See, e.g. Independent Life & Accident Insurance Co. v. Peavey,* 528 So. 2d 1112 (Miss. 1988)($250,000 punitive damages award affirmed where actual damages only $412.20 in case of wrongful denial of life insurance benefits).

¶87. An insured is put to tremendous disadvantage by post-claims underwriting. Not only is he thwarted from recovering on the claim at issue, but also, such as when health insurance is involved, may be precluded from obtaining further coverage on a specific condition. In this case, the insurer's post-claims underwriting practices also thrust the insureds into a protracted legal fray that has lasted nearly a decade when, after the Mooneyhans filed suit to enforce the provisions of their insurance policy, Dixie counterclaimed for fraud and misrepresentation and sought punitive damages from them! "Insurance consumers in Mississippi are entitled to protection from such practices, and here that protection was provided at the hands of the jury." *Todd*, 492 So. 2d at 935. Accordingly, I would affirm the punitive damages award.

**SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

1. Since this Court's decision in *Ivy* the Mississippi Legislature has passed a statute setting out procedures to be followed in actions where punitive damages are sought. See Miss. Code Ann. § 11-1-65 (Supp. 1994).